(Slip Opinion)    OCTOBER TERM, 2006    1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PANETTI *v.* QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 06–6407.  Argued April 18, 2007—Decided June 28, 2007

Petitioner was convicted of capital murder in a Texas state court and sentenced to death despite his well-documented history of mental illness.  After the Texas courts denied relief on direct appeal, petitioner filed a federal habeas petition pursuant to 28 U. S. C. §2254, but the District Court and the Fifth Circuit rejected his claims, and this Court denied certiorari.  In the course of these initial state and federal proceedings, petitioner did not argue that mental illness rendered him incompetent to be executed.  Once the state trial court set an execution date, petitioner filed a motion under Texas law claiming, for the first time, that he was incompetent to be executed because of mental illness.  The trial judge denied the motion without a hearing and the Texas Court of Criminal Appeals dismissed petitioner's appeal for lack of jurisdiction.

He then filed another federal habeas petition under §2254, and the District Court stayed his execution to allow the state trial court time to consider evidence of his then-current mental state.  Once the state court began its adjudication, petitioner submitted 10 motions in which he requested, *inter alia*, a competency hearing and funds for a mental health expert.  The court indicated it would rule on the outstanding motions once it had received the report written by the experts that it had appointed to review petitioner's mental condition.  The experts subsequently filed this report, which concluded, *inter alia,* that petitioner had the ability to understand the reason he was to be executed.  Without ruling on the outstanding motions, the judge found petitioner competent and closed the case.  Petitioner then returned to the Federal District Court, seeking a resolution of his pend-

ing §2254 petition. The District Court concluded that the state-court competency proceedings failed to comply with Texas law and were constitutionally inadequate in light of the procedural requirements mandated by *Ford* v. *Wainwright*, 477 U. S. 399, 410, where this Court held that the Eighth Amendment prohibits States from inflicting the death penalty upon insane prisoners. Although the court therefore reviewed petitioner's incompetency claim without deferring to the state court's finding of competency, it nevertheless granted no relief, finding that petitioner had not demonstrated that he met the standard for incompetency. Under Fifth Circuit precedent, the court explained, petitioner was competent to be executed so long as he knew the fact of his impending execution and the factual predicate for it. The Fifth Circuit affirmed.

*Held:*

   1. This Court has statutory authority to adjudicate the claims raised in petitioner's second federal habeas application. Because §2244(b)(2) requires that "[a] claim presented in a second or successive . . . [§2254] application . . . that was not presented in a prior application . . . be dismissed," the State maintains that the failure of petitioner's first §2254 application to raise a *Ford*-based incompetency claim deprived the District Court of jurisdiction. The results this argument would produce show its flaws. Were the State's interpretation of "second or successive" correct, a prisoner would have two options: forgo the opportunity to raise a *Ford* claim in federal court; or raise the claim in a first federal habeas application even though it is premature. *Stewart* v. *Martinez-Villareal*, 523 U. S. 637, 644. The dilemma would apply not only to prisoners with mental conditions that, at the time of the initial habeas filing, were indicative of incompetency but also to all other prisoners, including those with no early sign of mental illness. Because all prisoners are at risk of deteriorations in their mental state, conscientious defense attorneys would be obliged to file unripe (and, in many cases, meritless) *Ford* claims in each and every §2254 application. This counterintuitive approach would add to the burden imposed on courts, applicants, and the States, with no clear advantage to any. The more reasonable interpretation of §2244, suggested by this Court's precedents, is that Congress did not intend the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) addressing "second or successive" habeas petitions to govern a filing in the unusual posture presented here: a §2254 application raising a *Ford*-based incompetency claim filed as soon as that claim is ripe. See, *e.g., Martinez-Villareal, supra*, at 643–645. This conclusion is confirmed by AEDPA's purposes of "further[ing] comity, finality, and federalism," *Miller-El* v. *Cockrell*, 537 U. S. 322, 337, "promot[ing] judicial efficiency and con-

servation of judicial resources, . . . and lend[ing] finality to state court judgments within a reasonable time," *Day* v. *McDonough*, 547 U. S. 198, 205–206. These purposes, and the practical effects of the Court's holdings, should be considered when interpreting AEDPA, particularly where, as here, petitioners "run the risk" under the proposed interpretation of "forever losing their opportunity for any federal review of their unexhausted claims," *Rhines* v. *Weber*, 544 U. S. 269, 275. There is, finally, no argument in this case that petitioner proceeded in a manner that could be considered an abuse of the writ. Cf. *Felker* v. *Turpin*, 518 U. S. 651, 664. To the contrary, the Court has suggested that it is generally appropriate for a prisoner to wait before seeking the resolution of unripe incompetency claims. See, *e.g., Martinez-Villareal, supra*, at 644–645. Pp. 9–15.

   2. The state court failed to provide the procedures to which petitioner was entitled under the Constitution. *Ford* identifies the measures a State must provide when a prisoner alleges incompetency to be executed. Justice Powell's opinion concurring in part and concurring in the judgment in *Ford* controls, see *Marks* v. *United States*, 430 U. S. 188, 193, and constitutes "clearly established" governing law for AEDPA purposes, §2254(d)(1). As Justice Powell elaborated, once a prisoner seeking a stay of execution has made "a substantial threshold showing of insanity," 477 U. S., at 424, the Eighth and Fourteenth Amendments entitle him to, *inter alia,* a fair hearing, *ibid.,* including an opportunity to submit "expert psychiatric evidence that may differ from the State's own psychiatric examination," *id.*, at 427. The procedures the state court provided petitioner were so deficient that they cannot be reconciled with any reasonable interpretation of the *Ford* rule. It is uncontested that petitioner made a substantial showing of incompetency. It is also evident from the record, however, that the state court reached its competency determination without holding a hearing or providing petitioner with an adequate opportunity to provide his own expert evidence. Moreover, there is a strong argument that the court violated state law by failing to provide a competency hearing. If so, the violation undermines any reliance the State might now place on Justice Powell's assertion that "the States should have substantial leeway to determine what process best balances the various interests at stake." *Id.,* at 427. Under AEDPA, a federal court may grant habeas relief, as relevant, only if a state court's "adjudication of [a] claim on the merits . . . resulted in a decision that . . . involved an unreasonable application" of the relevant federal law. §2254(d)(1). If the state court's adjudication is dependent on an antecedent unreasonable application of federal law, that requirement is satisfied, and the federal court must then resolve the claim without the deference AEDPA otherwise requires. See, *e.g.,*

*Wiggins* v. *Smith*, 539 U. S. 510, 534. Having determined that the state court unreasonably applied *Ford* when it accorded petitioner the procedures in question, this Court must now consider petitioner's claim on the merits without deferring to the state court's competency finding. Pp. 15–21.

   3. The Fifth Circuit employed an improperly restrictive test when it considered petitioner's claim of incompetency on the merits. Pp. 21–28.

      (a) The Fifth Circuit's incompetency standard is too restrictive to afford a prisoner Eighth Amendment protections. Petitioner's experts in the District Court concluded that, although he claims to understand that the State says it wants to execute him for murder, his mental problems have resulted in the delusion that the stated reason is a sham, and that the State actually wants to execute him to stop him from preaching. The Fifth Circuit held, based on its earlier decisions, that such delusions are simply not relevant to whether a prisoner can be executed so long as he is aware that the State has identified the link between his crime and the punishment to be inflicted. This test ignores the possibility that even if such awareness exists, gross delusions stemming from a severe mental disorder may put that awareness in a context so far removed from reality that the punishment can serve no proper purpose. It is also inconsistent with *Ford,* for none of the principles set forth therein is in accord with the Fifth Circuit's rule. Although the *Ford* opinions did not set forth a precise competency standard, the Court did reach the express conclusion that the Constitution "places a substantive restriction on the State's power to take the life of an insane prisoner," 477 U. S., at 405, because, *inter alia,* such an execution serves no retributive purpose, *id.*, at 408. It might be said that capital punishment is imposed because it has the potential to make the offender recognize at last the gravity of his crime and to allow the community as a whole, including the victim's surviving family and friends, to affirm its own judgment that the prisoner's culpability is so serious that the ultimate penalty must be sought and imposed. Both the potential for this recognition and the objective of community vindication are called into question, however, if the prisoner's only awareness of the link between the crime and the punishment is so distorted by mental illness that his awareness of the crime and punishment has little or no relation to the understanding shared by the community as a whole. A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it. *Ford* does not foreclose inquiry into the latter. To refuse to consider evidence of this nature is to mistake *Ford*'s holding and its logic. Pp. 21–28.

      (b) Although the Court rejects the Fifth Circuit's standard, it

Syllabus

does not attempt to set down a rule governing all competency determinations. The record is not as informative as it might be because it was developed by the District Court under the rejected standard, and, thus, this Court finds it difficult to amplify its conclusions or to make them more precise. It is proper to allow the court charged with overseeing the development of the evidentiary record the initial opportunity to resolve petitioner's constitutional claim. Pp. 28–30.

448 F. 3d 815, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which ROBERTS, C. J., and SCALIA and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 06–6407

_____

## SCOTT LOUIS PANETTI, PETITIONER *v.* NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 28, 2007]

JUSTICE KENNEDY delivered the opinion of the Court.

"[T]he Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane." *Ford* v. *Wainwright*, 477 U. S. 399, 409–410 (1986). The prohibition applies despite a prisoner's earlier competency to be held responsible for committing a crime and to be tried for it. Prior findings of competency do not foreclose a prisoner from proving he is incompetent to be executed because of his present mental condition. Under *Ford*, once a prisoner makes the requisite preliminary showing that his current mental state would bar his execution, the Eighth Amendment, applicable to the States under the Due Process Clause of the Fourteenth Amendment, entitles him to an adjudication to determine his condition. These determinations are governed by the substantive federal baseline for competency set down in *Ford*.

Scott Louis Panetti, referred to here as petitioner, was convicted and sentenced to death in a Texas state court. After the state trial court set an execution date, petitioner

made a substantial showing he was not competent to be executed. The state court rejected his claim of incompetency on the merits. Filing a petition for writ of habeas corpus in the United States District Court for the Western District of Texas, petitioner claimed again that his mental condition barred his execution; that the Eighth Amendment set forth a substantive standard for competency different from the one advanced by the State; and that prior state-court proceedings on the issue were insufficient to satisfy the procedural requirements mandated by *Ford*. The State denied these assertions and argued, in addition, that the federal courts lacked jurisdiction to hear petitioner's claims.

We conclude we have statutory authority to adjudicate the claims petitioner raises in his habeas application; we find the state court failed to provide the procedures to which petitioner was entitled under the Constitution; and we determine that the federal appellate court employed an improperly restrictive test when it considered petitioner's claim of incompetency on the merits. We therefore reverse the judgment of the Court of Appeals for the Fifth Circuit and remand the case for further consideration.

I

On a morning in 1992 petitioner awoke before dawn, dressed in camouflage, and drove to the home of his estranged wife's parents. Breaking the front-door lock, he entered the house and, in front of his wife and daughter, shot and killed his wife's mother and father. He took his wife and daughter hostage for the night before surrendering to police.

Tried for capital murder in 1995, petitioner sought to represent himself. The court ordered a psychiatric evaluation, which indicated that petitioner suffered from a fragmented personality, delusions, and hallucinations. 1 App. 9–14. The evaluation noted that petitioner had been

hospitalized numerous times for these disorders. *Id.*, at 10; see also *id.*, at 222. Evidence later revealed that doctors had prescribed medication for petitioner's mental disorders that, in the opinion of one expert, would be difficult for a person not suffering from extreme psychosis even to tolerate. See *id.*, at 233 ("I can't imagine anybody getting that dose waking up for two to three days. You cannot take that kind of medication if you are close to normal without absolutely being put out"). Petitioner's wife described one psychotic episode in a petition she filed in 1986 seeking extraordinary relief from the Texas state courts. See *id.*, at 38–40. She explained that petitioner had become convinced the devil had possessed their home and that, in an effort to cleanse their surroundings, petitioner had buried a number of valuables next to the house and engaged in other rituals. *Id.*, at 39. Petitioner nevertheless was found competent to be tried and to waive counsel. At trial he claimed he was not guilty by reason of insanity.

During his trial petitioner engaged in behavior later described by his standby counsel as "bizarre," "scary," and "trance-like." *Id.*, at 26, 21, 22. According to the attorney, petitioner's behavior both in private and in front of the jury made it evident that he was suffering from "mental incompetence," *id.*, at 26; see also *id.*, at 22-23, and the net effect of this dynamic was to render the trial "truly a judicial farce, and a mockery of self-representation," *id.*, at 26. There was evidence on the record, moreover, to indicate that petitioner had stopped taking his antipsychotic medication a few months before trial, see *id.*, at 339, 345, a rejection of medical advice that, it appears, petitioner has continued to this day with one brief exception, see Brief for Petitioner 16–17. According to expert testimony, failing to take this medication tends to exacerbate the underlying mental dysfunction. See *id.,* at 16, 18, n. 12; see also 1 App. 195, 228. And it is uncontested that, less

than two months after petitioner was sentenced to death, the state trial court found him incompetent to waive the appointment of state habeas counsel. See Brief for Petitioner 15, n. 10. It appears, therefore, that petitioner's condition has only worsened since the start of trial.

The jury found petitioner guilty of capital murder and sentenced him to death. Petitioner challenged his conviction and sentence both on direct appeal and through state habeas proceedings. The Texas courts denied his requests for relief. See *Panetti* v. *State*, No. 72,230 (Crim. App., Dec. 3, 1997); *Ex parte Panetti*, No. 37,145–01 (Crim. App., May 20, 1998). This Court twice denied a petition for certiorari. *Panetti* v. *Texas*, 525 U. S. 848 (1998); *Panetti* v. *Texas*, 524 U. S. 914 (1998).

Petitioner filed a petition for writ of habeas corpus pursuant to 28 U. S. C. §2254 in the United States District Court for the Western District of Texas. His claims were again rejected, both by the District Court, *Panetti* v. *Johnson*, Cause No. A–99–CV–260–SS (2001), and the Court of Appeals for the Fifth Circuit, *Panetti* v. *Cockrell*, 73 Fed. Appx. 78 (2003) (judgt. order), and we again denied a petition for certiorari, *Panetti* v. *Dretke*, 540 U. S. 1052 (2003). Among the issues petitioner raised in the course of these state and federal proceedings was his competency to stand trial and to waive counsel. Petitioner did not argue, however, that mental illness rendered him incompetent to be executed.

On October 31, 2003, Judge Stephen B. Ables of the 216th Judicial District Court in Gillespie County, Texas, set petitioner's execution date for February 5, 2004. See First Order Setting Execution in Cause No. 3310; Order Setting Execution in Cause No. 3310. On December 10, 2003, counsel for petitioner filed with Judge Ables a motion under Tex. Code Crim. Proc. Ann., Art. 46.05 (Vernon Supp. Pamphlet 2006). Petitioner claimed, for the first time, that due to mental illness he was incompetent to be

executed. The judge denied the motion without a hearing. When petitioner attempted to challenge the ruling, the Texas Court of Criminal Appeals dismissed his appeal for lack of jurisdiction, indicating it has authority to review an Art. 46.05 determination only when a trial court has determined a prisoner is incompetent. *Ex parte Panetti*, No. 74,868 (Jan. 28, 2004) *(per curiam)*.

Petitioner returned to federal court, where he filed another petition for writ of habeas corpus pursuant to §2254 and a motion for stay of execution. On February 4, 2004, the District Court stayed petitioner's execution to "allow the state court a reasonable period of time to consider the evidence of [petitioner's] current mental state." Order in Case No. A–04–CA–042–SS, 1 App. 113–114, 116.

The state court had before it, at that time, petitioner's Renewed Motion To Determine Competency To Be Executed (hereinafter Renewed Motion To Determine Competency). Attached to the motion were a letter and a declaration from two individuals, a psychologist and a law professor, who had interviewed petitioner while on death row on February 3, 2004. The new evidence, according to counsel, demonstrated that petitioner did not understand the reasons he was about to be executed.

Due to the absence of a transcript, the state-court proceedings after this point are not altogether clear. The claims raised before this Court nevertheless make it necessary to recount the procedural history in some detail. Based on the docket entries and the parties' filings it appears the following occurred.

The state trial court ordered the parties to participate in a telephone conference on February 9, 2004, to discuss the status of the case. There followed a court directive instructing counsel to submit, by February 20, the names of mental health experts the court should consider appointing pursuant to Art. 46.05(f). See *ibid.* ("If the trial court

determines that the defendant has made a substantial showing of incompetency, the court shall order at least two mental health experts to examine the defendant"). The court also gave the parties until February 20 to submit any motions concerning the competency procedures and advised it would hold another status conference on that same date. Defendant's Motion To Reconsider in Cause No. 3310, pp. 1–2 (Mar. 4, 2004) (hereinafter Motion to Reconsider).

On February 19, 2004, petitioner filed 10 motions related to the Art. 46.05 proceedings. They included requests for transcription of the proceedings, a competency hearing comporting with the procedural due process requirements set forth in *Ford*, and funds to hire a mental health expert. See Motion To Transcribe All Proceedings Related to Competency Determination Under Article 46.05 in Cause No. 3310; Motion To Ensure That The Article 46.05 "Final Competency Hearing" Comports With The Procedural Due Process Requirements of Ford in Cause No. 3310 (hereinafter Motion to Ensure); Ex Parte Motion for Prepayment of Funds To Hire Mental Health Expert To Assist Defense in Article 46.05 Proceedings in Cause No. 3310.

On February 20 the court failed to hold its scheduled status conference. Petitioner's counsel called the courthouse and was advised Judge Ables was out of the office for the day. Counsel then called the Gillespie County District Attorney, who explained that the judge had informed state attorneys earlier that week that he was cancelling the conference he had set and would appoint the mental health experts without input from the parties. Motion to Reconsider 2.

On February 23, 2004, counsel for petitioner received an order, dated February 20, advising that the court was appointing two mental health experts pursuant to Art. §46.05(f). Order in Cause No. 3310, p. 1 (Feb. 26, 2004), 1

App. 59. On February 25, at an informal status conference, the court denied two of petitioner's motions, indicating it would consider the others when the court-appointed mental health experts completed their evaluations. Motion to Reconsider 3. On March 4, petitioner filed a motion explaining that a delayed ruling would render a number of the motions moot. *Id.*, at 1. There is no indication the court responded to this motion.

The court-appointed experts returned with their evaluation on April 28, 2004. Concluding that petitioner "knows that he is to be executed, and that his execution will result in his death," and, moreover, that he "has the ability to understand the reason he is to be executed," the experts alleged that petitioner's uncooperative and bizarre behavior was due to calculated design: "Mr. Panetti deliberately and persistently chose to control and manipulate our interview situation," they claimed. 1 App. 75. They maintained that petitioner "could answer questions about relevant legal issues . . . if he were willing to do so." *Ibid.*

The judge sent a letter to counsel, including petitioner's attorney, Michael C. Gross, dated May 14, 2004. It said:

"Dear Counsel:
"It appears from the evaluations performed by [the court-appointed experts] that they are of the opinion that [petitioner] is competent to be executed in accordance with the standards set out in Art. 46.05 of the Code of Criminal Procedure.
"Mr. Gross, if you have any other matters you wish to have considered, please file them in the case papers and get me copies by 5:00 p.m. on May 21, 2004."

Petitioner responded with a filing entitled "Objections to Experts' Report, Renewed Motion for Funds To Hire Mental Health Expert and Investigator, Renewed Motion for Appointment of Counsel, and Motion for Competency Hearing" in Cause No. 3310 (May 24, 2004) (hereinafter

Objections to Experts' Report). In this filing petitioner criticized the methodology and conclusions of the court-appointed experts; asserted his continued need for a mental health expert as his own criticisms of the report were "by necessity limited," *id.*, at 1; again asked the court to rule on his outstanding motions for funds and appointment of counsel; and requested a competency hearing. Petitioner also argued, as a more general matter, that the process he had received thus far failed to comply with Art. 46.05 and the procedural mandates set by *Ford*.

The court, in response, closed the case. On May 26, it released a short order identifying the report submitted by the court-appointed experts and explaining that "[b]ased on the aforesaid doctors' reports, the Court finds that [petitioner] has failed to show, by a preponderance of the evidence, that he is incompetent to be executed." Order Regarding Competency To Be Executed in Cause No. 3310, 1 App. 99. The order made no mention of petitioner's motions or other filings. Petitioner did not appeal the ruling to the Court of Criminal Appeals, and he did not petition this Court for certiorari.

This background leads to the matter now before us. Petitioner returned to federal court, seeking resolution of the §2254 petition he had filed on January 26. The District Court granted petitioner's motions to reconsider, to stay his execution, to appoint counsel, and to provide funds. The court, in addition, set the case for an evidentiary hearing, which included testimony by a psychiatrist, a professor, and two psychologists, all called by petitioner, as well as two psychologists and three correctional officers, called by respondent. See 1 App. 117–135, 362–363; see also *id.*, at 136–336. We describe the substance of the experts' testimony in more detail later in our opinion.

On September 29, 2004, the District Court denied petitioner's habeas application on the merits. It concluded that the state trial court had failed to comply with Art.

46.05; found the state proceedings "constitutionally inadequate" in light of *Ford;* and reviewed petitioner's Eighth Amendment claim without deferring to the state court's finding of competency. *Panetti* v. *Dretke*, 401 F. Supp. 2d 702, 706, 705–706 (WD Tex. 2004). The court nevertheless denied relief. It found petitioner had not shown incompetency as defined by Circuit precedent. *Id.*, at 712. "Ultimately," the court explained, "the Fifth Circuit test for competency to be executed requires the petitioner know no more than the fact of his impending execution and the factual predicate for the execution." *Id.*, at 711. The Court of Appeals affirmed, *Panetti* v. *Dretke*, 448 F. 3d 815 (CA5 2006), and we granted certiorari, 549 U. S. ___ (2007).

## II

We first consider our jurisdiction. The habeas corpus application on review is the second one petitioner has filed in federal court. Under the gatekeeping provisions of 28 U. S. C. §2244(b)(2), "[a] claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed" except under certain, narrow circumstances. See §§2244(b)(2)(A)–(B).

The State maintains that, by direction of §2244, the District Court lacked jurisdiction to adjudicate petitioner's §2254 application. Its argument is straightforward: "[Petitioner's] first federal habeas application, which was fully and finally adjudicated on the merits, failed to raise a *Ford* claim," and, as a result, "[his] subsequent habeas application, which did raise a *Ford* claim, was a 'second or successive' application" under the terms of §2244(b)(2). Supplemental Brief for Respondent 1. The State contends, moreover, that any *Ford* claim brought in an application governed by §2244's gatekeeping provisions must be dismissed. See Supplemental Brief for Respondent 4–6

(citing §§2244(b)(2)(A)–(B)).

The State acknowledges that *Ford*-based incompetency claims, as a general matter, are not ripe until after the time has run to file a first federal habeas petition. See Supplemental Brief for Respondent 6. The State nevertheless maintains that its rule would not foreclose prisoners from raising *Ford* claims. Under *Stewart* v. *Martinez-Villareal*, 523 U. S. 637 (1998), the State explains, a federal court is permitted to review a prisoner's *Ford* claim once it becomes ripe if the prisoner preserved the claim by filing it in his first federal habeas application. Under the State's approach a prisoner contemplating a future *Ford* claim could preserve it by this means.

The State's argument has some force. The results it would produce, however, show its flaws. As in *Martinez-Villareal*, if the State's "interpretation of 'second or successive' were correct, the implications for habeas practice would be far reaching and seemingly perverse." 523 U. S., at 644. A prisoner would be faced with two options: forgo the opportunity to raise a *Ford* claim in federal court; or raise the claim in a first federal habeas application (which generally must be filed within one year of the relevant state-court ruling), even though it is premature. The dilemma would apply not only to prisoners with mental conditions indicative of incompetency but also to those with no early sign of mental illness. All prisoners are at risk of deteriorations in their mental state. As a result, conscientious defense attorneys would be obliged to file unripe (and, in many cases, meritless) *Ford* claims in each and every §2254 application. This counterintuitive approach would add to the burden imposed on courts, applicants, and the States, with no clear advantage to any.

We conclude there is another reasonable interpretation of §2244, one that does not produce these distortions and inefficiencies.

The phrase "second or successive" is not self-defining. It

takes its full meaning from our case law, including decisions predating the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214. See *Slack* v. *McDaniel*, 529 U. S. 473, 486 (2000) (citing *Martinez-Villareal, supra*); see also *Felker* v. *Turpin*, 518 U. S. 651, 664 (1996). The Court has declined to interpret "second or successive" as referring to all §2254 applications filed second or successively in time, even when the later filings address a state-court judgment already challenged in a prior §2254 application. See, *e.g.*, *Slack,* 529 U. S., at 487 (concluding that a second §2254 application was not "second or successive" after the petitioner's first application, which had challenged the same state-court judgment, had been dismissed for failure to exhaust state remedies); see also *id.*, at 486 (indicating that "pre-AEDPA law govern[ed]" the case before it but implying that the Court would reach the same result under AEDPA); see also *Martinez-Villareal, supra,* at 645.

Our interpretation of §2244 in *Martinez-Villareal* is illustrative. There the prisoner filed his first habeas application before his execution date was set. In the first application he asserted, *inter alia*, that he was incompetent to be executed, citing *Ford*. The District Court, among other holdings, dismissed the claim as premature; and the Court of Appeals affirmed the ruling. When the State obtained a warrant for the execution, the prisoner filed, for the second time, a habeas application raising the same incompetency claim. The State argued that because the prisoner "already had one 'fully-litigated habeas petition, the plain meaning of §2244(b) . . . requires his new petition to be treated as successive.'" 523 U. S., at 643.

We rejected this contention. While the later filing "may have been the second time that [the prisoner] had asked the federal courts to provide relief on his *Ford* claim," the Court declined to accept that there were, as a result, "two separate applications, [with] the second . . . necessarily

subject to §2244(b)." *Ibid.* The Court instead held that, in light of the particular circumstances presented by a *Ford* claim, it would treat the two filings as a single application. The petitioner "was entitled to an adjudication of all the claims presented in his earlier, undoubtedly reviewable, application for federal habeas relief." 523 U. S., at 643.

Our earlier holding does not resolve the jurisdictional question in the instant case. *Martinez-Villareal* did not address the applicability of §2244(b) "where a prisoner raises a *Ford* claim for the first time in a petition filed after the federal courts have already rejected the prisoner's initial habeas application." *Id.,* at 645, n. Yet the Court's willingness to look to the "implications for habeas practice" when interpreting §2244 informs the analysis here. *Id.,* at 644. We conclude, in accord with this precedent, that Congress did not intend the provisions of AEDPA addressing "second or successive" petitions to govern a filing in the unusual posture presented here: a §2254 application raising a *Ford*-based incompetency claim filed as soon as that claim is ripe.

Our conclusion is confirmed when we consider AEDPA's purposes. The statute's design is to "further the principles of comity, finality, and federalism." *Miller-El* v. *Cockrell*, 537 U. S. 322, 337 (2003) (internal quotation marks omitted). Cf. *Day* v. *McDonough*, 547 U. S. 198, 205–206 (2006) ("The AEDPA statute of limitation promotes judicial efficiency and conservation of judicial resources, safeguards the accuracy of state court judgments by requiring resolution of constitutional questions while the record is fresh, and lends finality to state court judgments within a reasonable time" (internal quotation marks omitted)).

These purposes, and the practical effects of our holdings, should be considered when interpreting AEDPA. This is particularly so when petitioners "run the risk" under the proposed interpretation of "forever losing their opportunity for any federal review of their unexhausted claims."

*Rhines* v. *Weber*, 544 U. S. 269, 275 (2005). See also *Castro* v. *United States*, 540 U. S. 375, 381 (2003). In *Rhines* "[w]e recognize[d] the gravity of [the] problem" posed when petitioners file applications with only some claims exhausted, as well as "the difficulty [this problem has] posed for petitioners and federal district courts alike." 544 U. S., at 275, 276. We sought to ensure our "solution to this problem [was] compatible with AEDPA's purposes." *Id.*, at 276. And in *Castro* we resisted an interpretation of the statute that would "produce troublesome results," "create procedural anomalies," and "close our doors to a class of habeas petitioners seeking review without any clear indication that such was Congress' intent." 540 U. S., at 380, 381. See also *Williams* v. *Taylor*, 529 U. S. 420, 437 (2000); *Johnson* v. *United States*, 544 U. S. 295, 308–309 (2005); *Duncan* v. *Walker*, 533 U. S. 167, 178 (2001); cf. *Granberry* v. *Greer*, 481 U. S. 129, 131–134 (1987).

An empty formality requiring prisoners to file unripe *Ford* claims neither respects the limited legal resources available to the States nor encourages the exhaustion of state remedies. See *Duncan, supra,* at 178. Instructing prisoners to file premature claims, particularly when many of these claims will not be colorable even at a later date, does not conserve judicial resources, "reduc[e] piecemeal litigation," or "streamlin[e] federal habeas proceedings." *Burton* v. *Stewart*, 549 U. S. ___, ___ (2007) (slip op., at 7) *(per curiam)* (internal quotation marks omitted). AEDPA's concern for finality, moreover, is not implicated, for under none of the possible approaches would federal courts be able to resolve a prisoner's *Ford* claim before execution is imminent. See *Martinez-Villareal, supra*, at 644–645 (acknowledging that the District Court was unable to resolve the prisoner's incompetency claim at the time of his initial habeas filing). And last-minute filings that are frivolous and designed to delay executions can be dismissed in the regular course. The requirement of a

threshold preliminary showing, for instance, will, as a general matter, be imposed before a stay is granted or the action is allowed to proceed.

There is, in addition, no argument that petitioner's actions constituted an abuse of the writ, as that concept is explained in our cases. Cf. *Felker*, 518 U. S., at 664 ("[AEDPA's] new restrictions on successive petitions constitute a modified res judicata rule, a restraint on what is called in habeas corpus practice 'abuse of the writ'"). To the contrary, we have confirmed that claims of incompetency to be executed remain unripe at early stages of the proceedings. See *Martinez-Villareal*, 523 U. S., at 644–645; see also *ibid.* (suggesting that it is therefore appropriate, as a general matter, for a prisoner to wait before seeking resolution of his incompetency claim); *Ford* v. *Wainwright*, 477 U. S. 399 (remanding the case to the District Court to resolve Ford's incompetency claim, even though Ford had brought that claim in a second federal habeas petition); *Barnard* v. *Collins*, 13 F. 3d 871, 878 (CA5 1994) ("[O]ur research indicates no reported decision in which a federal circuit court or the Supreme Court has denied relief of a petitioner's competency-to-be-executed claim on grounds of abuse of the writ"). See generally *McCleskey* v. *Zant*, 499 U. S. 467, 489–497 (1991).

In the usual case, a petition filed second in time and not otherwise permitted by the terms of §2244 will not survive AEDPA's "second or successive" bar. There are, however, exceptions. We are hesitant to construe a statute, implemented to further the principles of comity, finality, and federalism, in a manner that would require unripe (and, often, factually unsupported) claims to be raised as a mere formality, to the benefit of no party.

The statutory bar on "second or successive" applications does not apply to a *Ford* claim brought in an application filed when the claim is first ripe. Petitioner's habeas application was properly filed, and the District Court had

jurisdiction to adjudicate his claim.

## III
### A

Petitioner claims that the Eighth and Fourteenth Amendments of the Constitution, as elaborated by *Ford*, entitled him to certain procedures not provided in the state court; that the failure to provide these procedures constituted an unreasonable application of clearly established Supreme Court law; and that under §2254(d) this misapplication of *Ford* allows federal-court review of his incompetency claim without deference to the state court's decision.

We agree with petitioner that no deference is due. The state court's failure to provide the procedures mandated by *Ford* constituted an unreasonable application of clearly established law as determined by this Court. It is uncontested that petitioner made a substantial showing of incompetency. This showing entitled him to, among other things, an adequate means by which to submit expert psychiatric evidence in response to the evidence that had been solicited by the state court. And it is clear from the record that the state court reached its competency determination after failing to provide petitioner with this process, notwithstanding counsel's sustained effort, diligence, and compliance with court orders. As a result of this error, our review of petitioner's underlying incompetency claim is unencumbered by the deference AEDPA normally requires.

*Ford* identifies the measures a State must provide when a prisoner alleges incompetency to be executed. The four-Justice plurality in *Ford* concluded as follows:

"Although the condemned prisoner does not enjoy the same presumptions accorded a defendant who has yet to be convicted or sentenced, he has not lost the protection of the Constitution altogether; if the Constitu-

tion renders the fact or timing of his execution contingent upon establishment of a further fact, then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being. Thus, the ascertainment of a prisoner's sanity as a predicate to lawful execution calls for no less stringent standards than those demanded in any other aspect of a capital proceeding." 477 U. S., at 411–412.

Justice Powell's concurrence, which also addressed the question of procedure, offered a more limited holding. When there is no majority opinion, the narrower holding controls. See *Marks* v. *United States*, 430 U. S. 188, 193 (1977). Under this rule Justice Powell's opinion constitutes "clearly established" law for purposes of §2254 and sets the minimum procedures a State must provide to a prisoner raising a *Ford*-based competency claim.

Justice Powell's opinion states the relevant standard as follows. Once a prisoner seeking a stay of execution has made "a substantial threshold showing of insanity," the protection afforded by procedural due process includes a "fair hearing" in accord with fundamental fairness. *Ford*, 477 U. S., at 426, 424 (opinion concurring in part and concurring in judgment) (internal quotation marks omitted). This protection means a prisoner must be accorded an "opportunity to be heard," *id*., at 424 (internal quotation marks omitted), though "a constitutionally acceptable procedure may be far less formal than a trial," *id.,* at 427. As an example of why the state procedures on review in *Ford* were deficient, Justice Powell explained, the determination of sanity "appear[ed] to have been made *solely* on the basis of the examinations performed by state-appointed psychiatrists." *Id.,* at 424. "Such a procedure invites arbitrariness and error by preventing the affected parties from offering contrary medical evidence or even

from explaining the inadequacies of the State's examinations." *Ibid.*

Justice Powell did not set forth "the precise limits that due process imposes in this area." *Id.*, at 427. He observed that a State "should have substantial leeway to determine what process best balances the various interests at stake" once it has met the "basic requirements" required by due process. *Ibid.* These basic requirements include an opportunity to submit "evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination." *Ibid.*

Petitioner was entitled to these protections once he had made a "substantial threshold showing of insanity." *Id.*, at 426. He made this showing when he filed his Renewed Motion To Determine Competency—a fact disputed by no party, confirmed by the trial court's appointment of mental health experts pursuant to Article 46.05(f), and verified by our independent review of the record. The Renewed Motion included pointed observations made by two experts the day before petitioner's scheduled execution; and it incorporated, through petitioner's first Motion To Determine Competency, references to the extensive evidence of mental dysfunction considered in earlier legal proceedings.

In light of this showing, the state court failed to provide petitioner with the minimum process required by *Ford*.

The state court refused to transcribe its proceedings, notwithstanding the multiple motions petitioner filed requesting this process. To the extent a more complete record may have put some of the court's actions in a more favorable light, this only constitutes further evidence of the inadequacy of the proceedings. Based on the materials available to this Court, it appears the state court on repeated occasions conveyed information to petitioner's counsel that turned out not to be true; provided at least one significant update to the State without providing the

same notice to petitioner; and failed in general to keep petitioner informed as to the opportunity, if any, he would have to present his case. There is also a strong argument the court violated state law by failing to provide a competency hearing. See Tex. Code Crim. Proc. Ann., Art. 46.05(k). If this did, in fact, constitute a violation of the procedural framework Texas has mandated for the adjudication of incompetency claims, the violation undermines any reliance the State might now place on Justice Powell's assertion that "the States should have substantial leeway to determine what process best balances the various interests at stake." *Ford, supra*, at 427. See also, *e.g.*, Brief for Respondent 16. What is more, the order issued by the state court implied that its determination of petitioner's competency was made solely on the basis of the examinations performed by the psychiatrists it had appointed— precisely the sort of adjudication Justice Powell warned would "invit[e] arbitrariness and error," *Ford, supra*, at 424.

The state court made an additional error, one that *Ford* makes clear is impermissible under the Constitution: It failed to provide petitioner with an adequate opportunity to submit expert evidence in response to the report filed by the court-appointed experts. The court mailed the experts' report to both parties in the first week of May. The report, which rejected the factual basis for petitioner's claim, set forth new allegations suggesting that petitioner's bizarre behavior was due, at least in part, to deliberate design rather than mental illness. Petitioner's counsel reached the reasonable conclusion that these allegations warranted a response. See Objections to Experts' Report 13, and n. 1. On May 14 the court told petitioner's counsel, by letter, to file "any other matters you wish to have considered" within a week. Petitioner, in response, renewed his motions for an evidentiary hearing, funds to hire a mental health expert, and other relief. He did not submit at that

time expert psychiatric evidence to challenge the court-appointed experts' report, a decision that in context made sense: The court had said it would rule on his outstanding motions, which included a request for funds to hire a mental-health expert and a request for an evidentiary hearing, once the court-appointed experts had completed their evaluation. Counsel was justified in relying on this representation by the court.

Texas law, moreover, provides that a court's finding of incompetency will be made on the basis of, *inter alia*, a "final competency hearing." Tex. Code Crim. Proc. Ann., Art. 46.05(k); see also *Ex parte Caldwell*, 58 S. W. 3d 127, 129, 130 (Tex. Crim. App. 2000) (confirming that the "legislature codified the dictates of *Ford* by enacting [the precursor to Art. 46.05]" and indicating that "[t]he determination of whether to appoint experts and conduct a hearing is within the discretion of the trial court" *before* a petitioner has made a substantial showing of incompetency). Had the court advised counsel it would resolve the case without first ruling on petitioner's motions and without holding a competency hearing, petitioner's counsel might have managed to procure the assistance of experts, as he had been able to do on a *pro bono* basis the day before petitioner's previously scheduled execution. It was, in any event, reasonable for counsel to refrain from procuring and submitting expert psychiatric evidence while waiting for the court to rule on the timely filed motions, all in reliance on the court's assurances.

But at this point the court simply ended the matter.

The state court failed to provide petitioner with a constitutionally adequate opportunity to be heard. After a prisoner has made the requisite threshold showing, *Ford* requires, at a minimum, that a court allow a prisoner's counsel the opportunity to make an adequate response to evidence solicited by the state court. See 477 U. S., at 424, 427. In petitioner's case this meant an opportunity to

submit psychiatric evidence as a counterweight to the report filed by the court-appointed experts. *Id.*, at 424. Yet petitioner failed to receive even this rudimentary process.

In light of this error we need not address whether other procedures, such as the opportunity for discovery or for the cross-examination of witnesses, would in some cases be required under the Due Process Clause. As *Ford* makes clear, the procedural deficiencies already identified constituted a violation of petitioner's federal rights.

B

The state court's denial of certain of petitioner's motions rests on an implicit finding: that the procedures it provided were adequate to resolve the competency claim. In light of the procedural history we have described, however, this determination cannot be reconciled with any reasonable application of the controlling standard in *Ford*.

That the standard is stated in general terms does not mean the application was reasonable. AEDPA does not "require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *Carey* v. *Musladin*, 549 U. S. ___, ___ (2006) (slip op., at 2) (KENNEDY, J., concurring in judgment). Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts "different from those of the case in which the principle was announced." *Lockyer* v. *Andrade*, 538 U. S. 63, 76 (2003). The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner. See, *e.g.*, *Williams* v. *Taylor*, 529 U. S. 362 (finding a state-court decision both contrary to and involving an unreasonable application of the standard set forth in *Strickland* v. *Washington*, 466 U. S. 668 (1984)). These principles guide a reviewing court that is faced, as we are here, with a record that cannot, under any reasonable

interpretation of the controlling legal standard, support a certain legal ruling.

Under AEDPA, a federal court may grant habeas relief, as relevant, only if the state court's "adjudication of [a] claim on the merits . . . resulted in a decision that . . . involved an unreasonable application" of the relevant law. When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in §2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires. See *Wiggins* v. *Smith*, 539 U. S. 510, 534 (2003) (performing the analysis required under *Strickland*'s second prong without deferring to the state court's decision because the state court's resolution of *Strickland*'s first prong involved an unreasonable application of law); *id.*, at 527–529 (confirming that the state court's ultimate decision to reject the prisoner's ineffective-assistance-of-counsel claim was based on the first prong and not the second). See also *Williams*, *supra*, at 395–397; *Early* v. *Packer*, 537 U. S. 3, 8 (2002) *(per curiam)* (indicating that §2254 does not preclude relief if either "the reasoning [or] the result of the state-court decision contradicts [our cases]"). Here, due to the state court's unreasonable application of *Ford*, the factfinding procedures upon which the court relied were "not adequate for reaching reasonably correct results" or, at a minimum, resulted in a process that appeared to be "seriously inadequate for the ascertainment of the truth." 477 U. S., at 423–424 (Powell, J., concurring in part and concurring in judgment) (internal quotation marks omitted). We therefore consider petitioner's claim on the merits and without deferring to the state court's finding of competency.

## IV

### A

This brings us to the question petitioner asks the Court

to resolve: whether the Eighth Amendment permits the execution of a prisoner whose mental illness deprives him of "the mental capacity to understand that [he] is being executed as a punishment for a crime." Brief for Petitioner 31.

A review of the expert testimony helps frame the issue. Four expert witnesses testified on petitioner's behalf in the District Court proceedings. One explained that petitioner's mental problems are indicative of "schizo-affective disorder," 1 App. 143, resulting in a "genuine delusion" involving his understanding of the reason for his execution, *id.*, at 157. According to the expert, this delusion has recast petitioner's execution as "part of spiritual warfare . . . between the demons and the forces of the darkness and God and the angels and the forces of light." *Id.*, at 149. As a result, the expert explained, although petitioner claims to understand "that the state is saying that [it wishes] to execute him for [his] murder[s]," he believes in earnest that the stated reason is a "sham" and the State in truth wants to execute him "to stop him from preaching." *Ibid.* Petitioner's other expert witnesses reached similar conclusions concerning the strength and sincerity of this "fixed delusion." *Id.*, at 203; see also *id.*, at 202, 231–232, 333.

While the State's expert witnesses resisted the conclusion that petitioner's stated beliefs were necessarily indicative of incompetency, see *id.*, at 240, 247, 304, particularly in light of his perceived ability to understand certain concepts and, at times, to be "clear and lucid," *id.*, at 243; see also *id.*, at 244, 304, 312, they acknowledged evidence of mental problems, see *id.*, at 239, 245, 308. Petitioner's rebuttal witness attempted to reconcile the experts' testimony:

"Well, first, you have to understand that when somebody is schizophrenic, it doesn't diminish their cogni-

tive ability. . . . Instead, you have a situation where—and why we call schizophrenia thought dis-order[—]the logical integration and reality connection of their thoughts are disrupted, so the stimulus comes in, and instead of being analyzed and processed in a rational, logical, linear sort of way, it gets scrambled up and it comes out in a tangential, circumstantial, symbolic . . . not really relevant kind of way. That's the essence of somebody being schizophrenic. . . . Now, it may be that if they're dealing with someone who's more familiar . . . [in] what may feel like a safer, more enclosed environment . . . those sorts of interactions may be reasonably lucid whereas a more extended conversation about more loaded material would reflect the severity of his mental illness." *Id.*, at 328–329.

See also *id.*, at 203 (suggesting that an unmedicated individual suffering from schizophrenia can "at times" hold an ordinary conversation and that "it depends [whether the discussion concerns the individual's] fixed delusional system"). There is, in short, much in the record to support the conclusion that petitioner suffers from severe delusions. See, *e.g.*, 1 App. 157, 149, 202–203, 231–232, 328–329, 333; see generally *id.*, at 136–353.

The legal inquiry concerns whether these delusions can be said to render him incompetent. The Court of Appeals held that they could not. That holding, we conclude, rests on a flawed interpretation of *Ford*.

The Court of Appeals stated that competency is determined by whether a prisoner is aware "'that he [is] going to be executed and why he [is] going to be executed,'" 448 F. 3d, at 819 (quoting *Barnard*, 13 F. 3d, at 877); see also 448 F. 3d, at 818 (discussing *Ford,* 477 U. S., at 421–422 (Powell, J., concurring in part and concurring in judgment)). To this end, the Court of Appeals identified the relevant District Court findings as follows: first, petitioner

is aware that he committed the murders; second, he is aware that he will be executed; and, third, he is aware that the reason the State has given for the execution is his commission of the crimes in question. 448 F. 3d, at 817. Under Circuit precedent this ends the analysis as a matter of law; for the Court of Appeals regards these three factual findings as necessarily demonstrating that a prisoner is aware of the reason for his execution.

The Court of Appeals concluded that its standard foreclosed petitioner from establishing incompetency by the means he now seeks to employ: a showing that his mental illness obstructs a rational understanding of the State's reason for his execution. *Id.*, at 817–818. As the court explained, "[b]ecause we hold that 'awareness,' as that term is used in *Ford*, is not necessarily synonymous with 'rational understanding,' as argued by [petitioner,] we conclude that the district court's findings are sufficient to establish that [petitioner] is competent to be executed." *Id.*, at 821.

In our view the Court of Appeals' standard is too restrictive to afford a prisoner the protections granted by the Eighth Amendment. The opinions in *Ford*, it must be acknowledged, did not set forth a precise standard for competency. The four-Justice plurality discussed the substantive standard at a high level of generality; and Justice Powell wrote only for himself when he articulated more specific criteria. Yet in the portion of Justice Marshall's discussion constituting the opinion of the Court (the portion Justice Powell joined) the majority did reach the express conclusion that the Constitution "places a substantive restriction on the State's power to take the life of an insane prisoner." *Ford*, 477 U. S., at 405. The Court stated the foundation for this principle as follows:

"[T]oday, no less than before, we may seriously question the retributive value of executing a person who

has no comprehension of why he has been singled out and stripped of his fundamental right to life. . . . Similarly, the natural abhorrence civilized societies feel at killing one who has no capacity to come to grips with his own conscience or deity is still vivid today. And the intuition that such an execution simply offends humanity is evidently shared across this Nation. Faced with such widespread evidence of a restriction upon sovereign power, this Court is compelled to conclude that the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane." *Id.*, at 409–410.

Writing for four Justices, Justice Marshall concluded by indicating that the Eighth Amendment prohibits execution of "one whose mental illness prevents him from comprehending the reasons for the penalty or its implications." *Id.*, at 417. Justice Powell, in his separate opinion, asserted that the Eighth Amendment "forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it," *id.*, at 422.

The Court of Appeals' standard treats a prisoner's delusional belief system as irrelevant if the prisoner knows that the State has identified his crimes as the reason for his execution. See 401 F. Supp. 2d, at 712 (indicating that under Circuit precedent "a petitioner's delusional beliefs— even those which may result in a fundamental failure to appreciate the connection between the petitioner's crime and his execution—do not bear on the question of whether the petitioner 'knows the reason for his execution' for the purposes of the Eighth Amendment"); see also *id.*, at 711– 712. Yet the *Ford* opinions nowhere indicate that delusions are irrelevant to "comprehen[sion]' or "aware[ness]" if they so impair the prisoner's concept of reality that he cannot reach a rational understanding of the reason for the execution. If anything, the *Ford* majority suggests the

opposite.

Explaining the prohibition against executing a prisoner who has lost his sanity, Justice Marshall in the controlling portion of his opinion set forth various rationales, including recognition that "the execution of an insane person simply offends humanity," *id.,* at 407; that it "provides no example to others," *ibid.;* that "it is uncharitable to dispatch an offender into another world, when he is not of a capacity to fit himself for it," *ibid.* (internal quotation marks omitted); that "madness is its own punishment," *ibid.;* and that executing an insane person serves no retributive purpose, *id.*, at 408.

Considering the last—whether retribution is served—it might be said that capital punishment is imposed because it has the potential to make the offender recognize at last the gravity of his crime and to allow the community as a whole, including the surviving family and friends of the victim, to affirm its own judgment that the culpability of the prisoner is so serious that the ultimate penalty must be sought and imposed. The potential for a prisoner's recognition of the severity of the offense and the objective of community vindication are called in question, however, if the prisoner's mental state is so distorted by a mental illness that his awareness of the crime and punishment has little or no relation to the understanding of those concepts shared by the community as a whole. This problem is not necessarily overcome once the test set forth by the Court of Appeals is met. And under a similar logic the other rationales set forth by *Ford* fail to align with the distinctions drawn by the Court of Appeals.

Whether *Ford*'s inquiry into competency is formulated as a question of the prisoner's ability to "comprehen[d] the reasons" for his punishment or as a determination into whether he is "unaware of . . . why [he is] to suffer it," then, the approach taken by the Court of Appeals is inconsistent with *Ford.* The principles set forth in *Ford* are put

at risk by a rule that deems delusions relevant only with respect to the State's announced reason for a punishment or the fact of an imminent execution, see 448 F. 3d, at 819, 821, as opposed to the real interests the State seeks to vindicate. We likewise find no support elsewhere in *Ford*, including in its discussions of the common law and the state standards, for the proposition that a prisoner is automatically foreclosed from demonstrating incompetency once a court has found he can identify the stated reason for his execution. A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it. *Ford* does not foreclose inquiry into the latter.

This is not to deny the fact that a concept like rational understanding is difficult to define. And we must not ignore the concern that some prisoners, whose cases are not implicated by this decision, will fail to understand why they are to be punished on account of reasons other than those stemming from a severe mental illness. The mental state requisite for competence to suffer capital punishment neither presumes nor requires a person who would be considered "normal," or even "rational," in a layperson's understanding of those terms. Someone who is condemned to death for an atrocious murder may be so callous as to be unrepentant; so self-centered and devoid of compassion as to lack all sense of guilt; so adept in transferring blame to others as to be considered, at least in the colloquial sense, to be out of touch with reality. Those states of mind, even if extreme compared to the criminal population at large, are not what petitioner contends lie at the threshold of a competence inquiry. The beginning of doubt about competence in a case like petitioner's is not a misanthropic personality or an amoral character. It is a psychotic disorder.

Petitioner's submission is that he suffers from a severe, documented mental illness that is the source of gross

delusions preventing him from comprehending the meaning and purpose of the punishment to which he has been sentenced. This argument, we hold, should have been considered.

The flaws of the Court of Appeals' test are pronounced in petitioner's case. Circuit precedent required the District Court to disregard evidence of psychological dysfunction that, in the words of the judge, may have resulted in petitioner's "fundamental failure to appreciate the connection between the petitioner's crime and his execution." 401 F. Supp. 2d, at 712. To refuse to consider evidence of this nature is to mistake *Ford*'s holding and its logic. Gross delusions stemming from a severe mental disorder may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose. It is therefore error to derive from *Ford*, and the substantive standard for incompetency its opinions broadly identify, a strict test for competency that treats delusional beliefs as irrelevant once the prisoner is aware the State has identified the link between his crime and the punishment to be inflicted.

B

Although we reject the standard followed by the Court of Appeals, we do not attempt to set down a rule governing all competency determinations. The record is not as informative as it might be, even on the narrower issue of how a mental illness of the sort alleged by petitioner might affect this analysis. In overseeing the development of the record and in making its factual findings, the District Court found itself bound to analyze the question of competency in the terms set by Circuit precedent. It acknowledged, for example, the "difficult issue" posed by the delusions allegedly interfering with petitioner's understanding of the reason behind his execution, 401 F. Supp.

2d, at 712, but it refrained from making definitive findings of fact with respect to these matters, see *id.*, at 709. See also *id.*, at 712 (identifying testimony by Dr. Mark Cunningham indicating that petitioner "believes the State is in league with the forces of evil that have conspired against him" and, as a result, "does not even understand that the State of Texas is a lawfully constituted authority," but refraining from setting forth definitive findings of fact concerning whether this was an accurate characterization of petitioner's mindset).

The District Court declined to consider the significance those findings might have on the ultimate question of competency under the Eighth Amendment. See *ibid.* (disregarding Dr. Cunningham's testimony in light of Circuit precedent). And notwithstanding the numerous questions the District Court asked of the witnesses, see, *e.g.*, 1 App. 191–197, 216–218, 234–237, 321–323, it did not press the experts on the difficult issue it identified in its opinion, see *ibid.* The District Court, of course, was bound by Circuit precedent, and the record was developed pursuant to a standard we have found to be improper. As a result, we find it difficult to amplify our conclusions or to make them more precise. We are also hesitant to decide a question of this complexity before the District Court and the Court of Appeals have addressed, in a more definitive manner and in light of the expert evidence found to be probative, the nature and severity of petitioner's alleged mental problems.

The underpinnings of petitioner's claims should be explained and evaluated in further detail on remand. The conclusions of physicians, psychiatrists, and other experts in the field will bear upon the proper analysis. Expert evidence may clarify the extent to which severe delusions may render a subject's perception of reality so distorted that he should be deemed incompetent. Cf. Brief for American Psychological Association et al. as *Amici Curiae*

17–19 (discussing the ways in which mental health experts can inform competency determinations). And there is precedent to guide a court conducting Eighth Amendment analysis. See, *e.g., Roper* v. *Simmons*, 543 U. S. 551, 560–564 (2005); *Atkins* v. *Virginia*, 536 U. S. 304, 311–314 (2002); *Ford*, 477 U. S., at 406–410.

It is proper to allow the court charged with overseeing the development of the evidentiary record in this case the initial opportunity to resolve petitioner's constitutional claim. These issues may be resolved in the first instance by the District Court.

\*          \*          \*

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 06–6407

———————

SCOTT LOUIS PANETTI, PETITIONER *v.* NATHANIEL
QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS
DIVISION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 28, 2007]

JUSTICE THOMAS, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE ALITO join, dissenting.

Scott Panetti's mental problems date from at least 1981. While Panetti's mental illness may make him a sympathetic figure, state and federal courts have repeatedly held that he is competent to face the consequences of the two murders he committed. In a competency hearing prior to his trial in 1995, a jury determined that Panetti was competent to stand trial. A judge then determined that Panetti was competent to represent himself. At his trial, the jury rejected Panetti's insanity defense, which was supported by the testimony of two psychiatrists. Since the trial, both state and federal habeas courts have rejected Panetti's claims that he was incompetent to stand trial and incompetent to waive his right to counsel.

This case should be simple. Panetti brings a claim under *Ford* v. *Wainwright*, 477 U. S. 399 (1986), that he is incompetent to be executed. Presented for the first time in Panetti's second federal habeas application, this claim undisputedly does not meet the statutory requirements for filing a "second or successive" habeas application. As such, Panetti's habeas application must be dismissed. Ignoring this clear statutory mandate, the Court bends

over backwards to allow Panetti to bring his *Ford* claim despite no evidence that his condition has worsened—or even changed—since 1995. Along the way, the Court improperly refuses to defer to the state court's finding of competency even though Panetti had the opportunity to submit evidence and to respond to the court-appointed experts' report. Moreover, without undertaking even a cursory Eighth Amendment analysis, the Court imposes a new standard for determining incompetency. I respectfully dissent.

I

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires applicants to receive permission from the court of appeals prior to filing second or successive federal habeas applications. 28 U. S. C. §2244(b)(3). Even if permission is sought, AEDPA requires courts to decline such requests in all but two narrow circumstances. §2244(b)(3)(C); §2244(b)(2).[1] Panetti raised his *Ford* claim for the first time in his second federal habeas application, *ante*, at 4–5, 9, but he admits that he did not seek authorization from the Court of Appeals and that his claim does not satisfy either of the statutory exceptions. Accordingly, §2244(b) requires dismissal of Panetti's "second . . . habeas

————————

[1] Section 2244(b)(2) states:

"A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—

"(A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

"(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

"(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

corpus application."

The Court reaches a contrary conclusion by reasoning that AEDPA's phrase "second or successive" "takes its full meaning from our case law, including decisions predating the enactment of [AEDPA]." *Ante*, at 11 (citing *Slack* v. *McDaniel*, 529 U. S. 473, 486 (2000)). But the Court fails to identify any pre-AEDPA case that defines, explains, or modifies the phrase "second or successive." Nor does the Court identify any pre-AEDPA case in which a subsequent habeas application challenging the same state-court judgment was considered anything but "second or successive."[2] To my knowledge, there are no such cases.

Before AEDPA's enactment, the phrase "second or successive" meant the same thing it does today—any subsequent federal habeas application challenging a state-court judgment that had been previously challenged in a federal habeas application. See, *e.g., Kuhlmann* v. *Wilson*, 477 U. S. 436, 451–452 (1986) (plurality opinion); *Barefoot* v. *Estelle*, 463 U. S. 880, 895 (1983). Prior to AEDPA, however, second or successive habeas applications were not always dismissed. Rather, the pre-AEDPA abuse of the writ doctrine allowed courts to entertain second or successive applications in certain circumstances. See 28 U. S. C. §2254(b) Rule 9(b) (1994 ed.) ("A second or successive petition may be dismissed [when] new and different grounds are alleged [if] the judge finds that the failure of the petitioner to assert those grounds in a prior petition

——————

[2] The Court identifies two post-AEDPA cases. *Ante*, at 11 (citing *Slack* v. *McDaniel*, 529 U. S. 473 (2000); *Stewart* v. *Martinez-Villareal*, 523 U. S. 637 (1998)). Because these cases were decided after AEDPA, they do not establish the pre-AEDPA meaning of "second or successive." Moreover, these cases do not apply here. The inapplicability of *Martinez-Villareal* is discussed below. *Infra*, at 5–6. Like *Martinez-Villareal*, the narrow exception described in *Slack* is akin to a renewal of an initial application. 529 U. S., at 486–487; see *infra*, at 5–6 (discussing *Martinez-Villareal*). Even the Court does not maintain that *Slack* applies to Panetti's claim.

constituted an abuse of the writ”); *McCleskey* v. *Zant*, 499
U. S. 467, 470 (1991); *Kuhlmann, supra*, at 451–452 (plu-
rality opinion); *Barefoot, supra*, at 895. Consistent with
this practice, prior to AEDPA, federal courts treated *Ford*
claims raised in subsequent habeas applications as “sec-
ond or successive” but usually allowed such claims to
proceed under the abuse of the writ doctrine.[3] See *Martin*
v. *Dugger*, 686 F. Supp. 1523, 1528 (SD Fla. 1988) (permit-
ting a *Ford* claim raised in a “second” habeas petition
“[b]ecause *Ford* was a substantial change in constitutional
law [and the prisoner] was unaware of the legal signifi-
cance of relevant facts”); *Barnard* v. *Collins*, 13 F. 3d 871,
875, 878 (CA5 1994); *Shaw* v. *Delo*, 762 F. Supp. 853, 857–
859 (ED Mo. 1991); *Johnson* v. *Cabana*, 661 F. Supp. 356,
364 (SD Miss. 1987). Still, though, at least one court
found a *Ford* claim raised in a subsequent application to
be an abuse of the writ. *Rector* v. *Lockhart*, 783 F. Supp.
398, 402–404 (ED Ark. 1992).

When it enacted AEDPA, Congress “further restrict[ed]
the availability of relief to habeas petitioners” and placed
new “limits on successive petitions.” *Felker* v. *Turpin*, 518
U. S. 651, 664 (1996). Instead of the judicial discretion

————————

[3] If, as the Court asserts, “second or successive” were a pre-AEDPA
term of art that excepted *Ford* claims, it would be difficult to explain
why, immediately following AEDPA’s passage, Courts of Appeals
uniformly considered subsequent applications raising *Ford* claims to be
“second or successive” under §2244. See *In re Medina*, 109 F. 3d 1556,
1563–1565 (CA11 1997) *(per curiam); In re Davis*, 121 F. 3d 952, 953–
955 (CA5 1997); see also *Martinez-Villareal* v. *Stewart*, 118 F. 3d 628,
630–631, 633–634 (CA9 1997) *(per curiam)* (finding §2244 applicable
but allowing a *Ford* claim to proceed where it was presented in the
initial habeas application).

The Courts of Appeals uniformly continue to hold that §2244 applies
to successive habeas applications raising *Ford* claims when the initial
application failed to do so. See, *e.g.*, *Richardson* v. *Johnson*, 256 F. 3d
257, 258–259 (CA5 2001); *In re Provenzano*, 215 F. 3d 1233, 1235 (CA11
2000); *Nguyen* v. *Gibson*, 162 F. 3d 600, 601 (CA10 1998) *(per curiam).*

that governed second or successive habeas applications prior to AEDPA, Congress required dismissal of all second and successive applications except in two specified circumstances. §2244(b)(2). AEDPA thus eliminated much of the discretion that previously saved second or successive habeas petitions from dismissal.

Stating that we "ha[ve] declined to interpret 'second or successive' as referring to all §2254 applications filed second or successively in time," *ante*, at 11, the Court relies upon *Stewart* v. *Martinez-Villareal*, 523 U. S. 637, 640, 645–646 (1998), in which we held that a subsequent application raising a *Ford* claim could go forward. In that case, however, the applicant had raised a *Ford* claim in his initial habeas application, and the District Court had dismissed it as unripe. 523 U. S., at 640. Refusing to treat the applicant's subsequent application as second or successive, the Court simply held that the second application renewed the *Ford* claim originally presented in the prior application:

> "This may have been the second time that respondent had asked the federal courts to provide relief on his *Ford* claim, but this does not mean that there were two separate applications, the second of which was necessarily subject to §2244(b). There was only one application for habeas relief, and the District Court ruled (or should have ruled) on each claim at the time it became ripe. Respondent was entitled to an adjudication of all of the claims presented in his earlier, undoubtedly reviewable, application for federal habeas relief." 523 U. S., at 643.

In other words, *Martinez-Villareal* held that where an applicant raises a *Ford* claim in an initial habeas application, §2244 does not bar a second application once the claim ripens because the second application is a continuation of the first application. 523 U. S., at 643–645; cf.

*Burton* v. *Stewart*, 549 U. S. ___, ___ (2007) (slip op., at 7) *(per curiam)* ("[U]nlike Burton, the prisoner [in *Martinez-Villareal*] had attempted to bring this claim in his initial habeas petition"). *Martinez-Villareal* does not apply here because Panetti did not bring his *Ford* claim in his initial habeas application.[4]

The Court does not and cannot argue that any time a claim would not be ripe in the first habeas petition, it may be raised in a later habeas petition. We unanimously rejected such an argument in *Burton* v. *Stewart*, *supra.* In *Burton*, the petitioner filed a federal habeas petition challenging his convictions but not challenging his sentence, which was at that time still on review in the state courts. After the state courts rejected his sentencing claims, the petitioner filed a second federal habeas petition, this time challenging his sentence. The Ninth Circuit held that Burton's second petition was not "second or successive" under AEDPA, "reason[ing] that because Burton had not exhausted his sentencing claims in state court when he filed the [first] petition, they were not ripe for federal habeas review at that time." *Id.*, at ___ (slip op., at 6) (internal quotation marks omitted). The Ninth Circuit found that the second petition was not foreclosed by AEDPA since the claim would not have been ripe if raised in the first petition. *Ibid.* We rejected the Ninth Circuit's view and held that AEDPA barred Burton's second petition. In light of *Burton*, it simply cannot be maintained that Panetti is excused from §2244's requirements solely

——————

[4] The Court claims that *Martinez-Villareal* "suggest[s] that it is . . . appropriate, as a general matter, for a prisoner to wait before seeking resolution of his incompetency claim." *Ante*, at 14. But *Martinez-Villareal* "suggest[s]" no such thing. 523 U. S., at 645. To the contrary, as the Court admits, *Martinez-Villareal* does not determine whether a prisoner would even be *allowed* to bring a *Ford* claim if he waits to bring it in a second petition. *Ante*, at 12 (citing *Martinez-Villareal, supra*, at 645, n.).

because his *Ford* claim would have been unripe had he included it in his first habeas application. Today's decision thus stands only for the proposition that *Ford* claims somehow deserve a special (and unjustified) exemption from the statute's plain import.

Because neither AEDPA's text, pre-AEDPA precedent, nor our AEDPA jurisprudence supports the Court's understanding of "second or successive," the Court falls back on judicial economy considerations. The Court suggests that my interpretation of the statute would create an incentive for every prisoner, regardless of his mental state, to raise and preserve a *Ford* claim in the event the prisoner later becomes insane. *Ante*, at 10, 13–14. Even if this comes to pass, it would not be the catastrophe the Court suggests. District courts could simply dismiss unripe *Ford* claims outright, and habeas applicants could then raise them in subsequent petitions under the safe harbor established by *Martinez-Villareal*. Requiring that *Ford* claims be included in an initial habeas application would have the added benefit of putting a State on notice that a prisoner intends to challenge his or her competency to be executed. In any event, regardless of whether the Court's concern is justified, judicial economy considerations cannot override AEDPA's plain meaning. Remaining faithful to AEDPA's mandate, I would dismiss Panetti's application as second or successive.

## II

The Court also errs in holding that the state court unreasonably applied "clearly established" Supreme Court precedent by failing to afford Panetti adequate procedural protections. *Ante*, at 15. Panetti is entitled to habeas relief only if the state-court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28

U. S. C. §2254(d)(1). Even if Justice Powell's concurrence in *Ford* qualifies as clearly established federal law on this point, the state court did not unreasonably apply *Ford*.[5]

## A

The procedural rights described in *Ford* are triggered only upon "a substantial threshold showing of insanity." 477 U. S., at 426 (Powell, J., concurring in part and concurring in judgment); *id.*, at 417 (plurality opinion) (using the term "high threshold"). Following an "independent review of the record," *ante*, at 17, the majority finds that Panetti has made a satisfactory threshold showing. That conclusion is insupportable.

Panetti filed only two exhibits with his Renewed Motion to Determine Competency in the state court. See Scott Panetti's Renewed Motion to Determine Competency to Be Executed in Cause No. 3310 (Gillespie Cty., Tex., 216th Jud. Dist., Feb. 4, 2004) (hereinafter Renewed Motion).[6]

––––––––

[5] To reach the tenuous conclusion that Justice Powell's opinion constitutes clearly established federal law, *ante*, at 16, the Court ignores the tension between Justice Powell's concern that adversarial proceedings may be counterproductive and the plurality's position that adversarial proceedings are required. Compare *Ford* v. *Wainwright*, 477 U. S. 399, 426 (1986) (Powell, J., concurring in part and concurring in judgment) (stating that "ordinary adversarial procedures—complete with live testimony, cross-examination, and oral argument by counsel—are not necessarily the best means of arriving at sound, consistent judgments as to a defendant's sanity"), with *id.,* at 415, 417 (plurality opinion) (discussing the importance of adversarial procedures, including cross-examination). Given these contradictory statements, it is difficult to say that Justice Powell's opinion is merely a narrower version of the plurality's view. See *Marks* v. *United States*, 430 U. S. 188, 193 (1977).

[6] This application was itself Panetti's second bite at the apple in the state court on the question of his competency to be executed. Panetti had previously presented a *Ford* claim in state court, but the documents that accompanied that filing contained "nothing . . . that re-late[d] to his current mental state." Order in Case No. A–04–CA–042–SS (WD Tex., Jan. 28, 2004), p. 4; *id.,* at 4 (Jan. 30, 2004) (same). As a result, the state court denied relief without a hearing, *ante*, at 5, and

The first was a one-page letter from Dr. Cunningham to Panetti's counsel describing his 85-minute "preliminary evaluation" of Panetti. Letter from Mark D. Cunningham, Ph.D., to Michael C. Gross (Feb. 3, 2004), 1 App. 108. Far from containing "pointed observations," *ante*, at 17, Dr. Cunningham's letter is unsworn, contains no diagnosis, and does not discuss whether Panetti understood why he was being executed. *Ibid.* Panetti's other exhibit was a one-page declaration of a *law professor* who attended Cunningham's 85-minute meeting with Panetti. Declaration of David R. Dow (Feb. 3, 2004), *id.,* at 110. Professor Dow obviously made no medical diagnosis and simply discussed his lay perception of Panetti's mental condition in a cursory manner. *Ibid.* The Court describes Dow as an "expert," *ante*, at 17, but law professors are obviously not experts when it comes to medical or psychological diagnoses.

Panetti's Renewed Motion attached no medical reports or records, no sworn testimony from any medical professional, and no diagnosis of any medical condition. The Court claims that Panetti referred "to the extensive evidence of mental dysfunction considered in earlier legal proceedings." *Ibid.* But as the Federal District Court noted, Panetti merely "outlined his mental health history for the time period from 1981 until 1997." Order in Case No. A–04–CA–042–SS (Jan. 30, 2004), p. 4. This evidence—previously rejected by the state and federal courts that adjudicated Panetti's other incompetency claims— had no relevance to Panetti's competency to be executed in 2004 when he filed his *Renewed* Motion. *Ibid.* In addition to the utter lack of new medical evidence, no layperson who had observed Panetti on a day-to-day basis, such as prison guards or fellow inmates, submitted an affidavit or

---

the Federal District Court found no error in this determination, Order in Case No. A–04–CA–042–SS (Jan. 30, 2004), p. 4.

even a letter. In short, Panetti supported his alleged incompetency with only the preliminary observations of a psychologist and a lawyer, whose only contact with Panetti was a single 85-minute meeting. It is absurd to suggest that this quantum of evidence clears the "high threshold," entitling claimants to the procedural protections described by the plurality and Justice Powell in *Ford*. 477 U. S., at 417 (plurality opinion); see also *id.*, at 426 (Powell, J., concurring in part and concurring in judgment).[7]

### B

Having determined that Panetti's evidence exceeded the high threshold set forth in *Ford*, the Court asserts that *Ford* requires that "a court allow a prisoner's counsel the opportunity to make an adequate response to evidence solicited by the state court." *Ante*, at 19 (citing *Ford, supra*, at 427 (Powell, J., concurring in part and concurring in judgment)). Justice Powell's concurrence states that a prisoner has the right to present his or her evidence to an impartial decisionmaker. In light of the facts before the Court in *Ford*, it becomes obvious that in this case Texas more than satisfied any obligations Justice Powell described.

─────────

[7]The Court argues that "the trial court's appointment of mental health experts pursuant to Article 46.05(f)" "confirmed" that Panetti had made a threshold showing. *Ante*, at 17. But the state court made no such finding and may have proceeded simply in an abundance of caution, perhaps to humor the Federal District Court, which had "stay[ed] the execution [for 60 days to] allow the state court a reasonable period of time to consider the evidence of Panetti's current mental state." Order in Case No. A–04–CA–042–SS (Feb. 4, 2004), p. 3, 1 App. 116. In any event, the question today is not whether Panetti met Texas' threshold but whether he met the constitutional one. The Court cannot avoid answering that question by relying on a related state-law determination.

1

Under the Florida law at issue in *Ford*, the Governor—not a court—made the final decision as to the condemned prisoner's sanity. 477 U. S., at 412 (plurality opinion). The prisoner could not submit any evidence and had no opportunity to be heard. *Id.*, at 412–413; *id.*, at 424 (Powell, J., concurring in part and concurring in judgment). In other words, the Florida procedures required neither a neutral decisionmaker nor an opportunity for the prisoner to present evidence. *Id.*, at 412–413; *id.*, at 424.

Against this backdrop, Justice Powell's concurrence states that due process requires an impartial decisionmaker and a chance to present evidence:

> "The State should provide an impartial officer or board that can receive evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination." *Id.*, at 427.

In setting forth these minimal procedural protections, Justice Powell explained that "[b]eyond these basic requirements, the States should have substantial leeway to determine what process best balances the various interests at stake." *Ibid.* Justice Powell stressed that "ordinary adversarial procedures . . . are not necessarily the best means of arriving at sound, consistent judgments as to a defendant's sanity." *Id.*, at 426.

2

Because a court considered Panetti's insanity claim, the state clearly satisfied Justice Powell's requirement to "provide an impartial officer or board." *Id.,* at 427. The sole remaining question, then, is whether the state court "receive[d] evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination." *Ibid.*

At the outset of its discussion, the Court suggests that
Texas is not entitled to "substantial leeway" in determin-
ing what procedures are appropriate, see *Ford, supra,* at
427 (Powell, J., concurring in part and concurring in judg-
ment), because Texas may have "violat[ed] the procedural
framework Texas has mandated for the adjudication of
incompetency claims." *Ante*, at 18. As its sole support for
that assertion, the Court states that there is "a strong
argument the court violated state law by failing to provide
a competency hearing." *Ibid.* But Article 46.05 of the
Texas Code of Criminal Procedure provides no right to a
competency hearing: "The determination of whether to
appoint experts and conduct a hearing [under Article
46.05] is within the discretion of the trial court." *Ex parte
Caldwell*, 58 S. W. 3d 127, 130 (Tex. Crim. App. 2000).
Contrary to the Court's statement, *ante*, at 19, this discre-
tion does not depend on whether a substantial showing of
incompetency has been made. See *Caldwell*, *supra*, at
130. Accordingly, there is no basis for denying Texas the
"substantial leeway" *Ford* grants to States.

Texas law allows prisoners to submit "affidavits, re-
cords, or other evidence supporting the defendant's allega-
tions" "that the defendant is presently incompetent to be
executed." Tex. Code Crim. Proc. Ann., Art. 46.05 (Vernon
Supp. Pamphlet 2006). Therefore, state law provided
Panetti with the legal right to submit whatever evidence
he wanted. Here, it is clear that the state court stood
ready and willing to consider any evidence Panetti wished
to submit. The record of the state proceedings shows that
Panetti took full advantage of this opportunity. For ex-
ample, after the court-appointed experts presented their
report, the state court gave Panetti a chance to respond, 1
App. 78, and Panetti filed a 17-page brief objecting to the
report and arguing that there were problems in its meth-

odology.[8]  Objections to Experts' Report, 1 App. 79.  No extensive consideration of Panetti's submitted evidence was necessary because the submissions—the single-page statements of one doctor and one lawyer—were paltry and unpersuasive.  That the evidence presented did not warrant more extensive examination does not change the fact that Panetti had an unlimited opportunity to submit evidence to the state court.

Based on Panetti's evidence, the report by the court-appointed experts, and Panetti's objections to that report, the state court found that "[d]efendant has failed to show, by a preponderance of the evidence, that he is incompetent to be executed."  *Id.,* at 99.  Given Panetti's meager evidentiary submissions, it is unsurprising that the state court declined to proceed further.  The Court asserts that "the order issued by the state court implied that its determination of petitioner's competency [improperly] was made solely on the basis of the examinations performed by the psychiatrists it had appointed."  *Ante*, at 18.  However, the order's focus on the report of the court-appointed experts indicates only that the court found the report to be persuasive.  1 App. 99.  Supported by the persuasive report of two neutral experts, the court reasonably concluded that Panetti's meager evidence deserved no men-

_____

   [8] The Court states that Panetti's "counsel reached the reasonable conclusion that these allegations warranted a response."  *Ante*, at 19.  But the Court fails to note that the 17-page brief *was* the response.  Apart from his motions, Panetti never requested the opportunity to respond further.

   Panetti criticized the court-appointed experts for visiting him only once, for not conducting psychological testing, for failing to review collateral information adequately, for failing to take into account his history of mental problems, and for the abbreviated nature of their conclusions.  Objections to Experts' Report, Renewed Motion for Funds to Hire Expert and Investigator, Renewed Motion for Competency Hearing in Cause No. 3310 (Gillespie Cty., Tex., 216th Jud. Dist., May 21, 2004), 1 App. 82–95 (hereinafter Objection to Experts' Report).

tion. See Part II–A, *supra.* In my view, the state court fairly implemented the procedures described by Justice Powell's opinion in *Ford*—to "receive evidence and argument from the prisoner's counsel." 477 U. S., at 427. At the very least, the state court did not unreasonably apply his concurrence. See 28 U. S. C. §2254(d)(1).

3

Because it cannot dispute that Panetti had an unlimited opportunity to present evidence, the Court argues that the state court "failed to provide petitioner with an adequate opportunity to submit expert evidence in response to the report filed by the court-appointed experts." *Ante*, at 18. According to the Court, this opportunity was denied to Panetti because the state court failed to rule explicitly on his motions and failed to warn him that he would receive no evidentiary hearing.[9] This position has no factual

───────────

[9] The Court does not assert that Panetti actually had a constitutional right to an evidentiary hearing or to have any of his 10 motions granted. As discussed above, Justice Powell's concurrence specifically rejected the *Ford* plurality's contention that an adversarial proceeding was constitutionally required or even appropriate. Part II–B–1, *supra.* Even a cursory look at Panetti's motions shows that the state court did not err in refusing to grant them. This Court has never recognized a right to state-provided experts or counsel on state habeas review. Cf. Ex Parte Motion for Prepayment of Funds to Hire Mental Health Expert to Assist Defense in Article 46.05 Proceedings in Cause No. 3310 (Feb. 19, 2004), 1 App. 54; Defendant's Motion for Appointment of Counsel to Assist Him in Article 46.05 Proceedings (Feb. 19, 2004), *id.,* at 45; Ex Parte Motion for Prepayment of Funds to Hire an Investigator to Assist Defense Counsel in Cause No. 3310 (Feb. 19, 2004). There is likewise no right to transcribed court proceedings, videotaped examinations, or any other specific protocols for conducting competency evaluations. Cf. Motion to Videotape All Competency Examinations of Scott Panetti Conducted by Court-Appointed Mental Health Experts in Cause No. 3310 (Feb. 19, 2004); Motion to Transcribe All Proceedings Related to Competency Determination Under Article 46.05 in Cause No. 3310 (Feb. 19, 2004); Motion Seeking Order Setting Out Protocol for Conducting Competency Evaluations of Scott Panetti in Cause No.

basis. After the court-appointed experts submitted their report, the state court made it clear that the case was proceeding to conclusion and that Panetti's counsel needed to submit anything else he wanted the judge to consider:

> "It appears from the evaluations performed by Dr. Mary Anderson and Dr. George Parker that they are of the opinion that Mr. Panetti is competent to be executed in accordance with the standards set out in Art. 46.05 of the Code of Criminal Procedure.
>
> "Mr. Gross, if you have any other matters you wish to have considered, please file them in the case papers and get me copies by 5:00 p.m. on May 21, 2004." Letter from District Judge Stephen B. Ables in Cause No. 3310 (May 14, 2004), 1 App. 77–78.

Panetti's counsel got the message. Far from assuming that there would be a hearing, *ante*, at 19–20, counsel renewed his motion requesting a competency hearing and his motion seeking state funding for a mental health expert. 1 App. 96–98. Panetti's filing indicates that he understood that no hearing was currently scheduled and that if he wanted to convince the state court not to deny relief, he needed to do so immediately. See *id.*, at 80–95. The record demonstrates that what Panetti actually sought was not the opportunity to submit additional evidence—because, at that time, he had no further evidence to submit—but state funding for his pursuit of more evidence. See Ex Parte Motion for Prepayment of Funds to Hire Mental Health Expert to Assist Defense in Article

--------

3310 (Feb. 19, 2004). And as discussed above, Panetti has no clearly established constitutional right to a formal, oral hearing, Part II–B–1, *supra,* much less a right to discovery. Cf. Defendant's Motion for Discovery in Cause No. 3310 (Feb. 19, 2004); Motion to Ensure that the Article 46.05 "Final Competency Hearing" Comports with the Procedural Due Process Requirements of *Ford* in Cause No. 3310 (Feb. 19, 2004), 1 App. 49.

46.05 Proceedings in Cause No. 3310 (Feb. 19, 2004), *id.,* at 54; Ex Parte Motion for Prepayment of Funds to Hire an Investigator to Assist Defense Counsel in Cause No. 3310 (Feb. 19, 2004); Defendant's Motion for Appointment of Counsel to Assist Him in Article 46.05 Proceedings in Cause No. 3310 (Feb. 19, 2004), *id.,* at 45; Panetti's Response to Show Cause Order in Case No. A–04–CA–042–SS (June 3, 2004), p. 5; cf. Order in Case No. A–04–CA–042–SS (Jan. 30, 2004), p. 4. This Court has never recognized a constitutional right to state funding for counsel in state habeas proceedings—much less for experts—and Texas law grants no such right in *Ford* proceedings. *E.g., Ex parte Caldwell*, 58 S. W. 3d 127, 130 (Tex. Crim. App. 2000) (holding that funding for counsel or experts in Article 46.05 proceedings is at the discretion of the district court); *Coleman* v. *Thompson*, 501 U. S. 722, 755 (1991) (noting that there is no constitutional right to state-funded counsel in state habeas cases).

In short, there is nothing in the record to suggest that Panetti would have submitted any additional evidence had he been given another opportunity to do so. Panetti never requested more time to submit evidence and never told the court that he wanted to submit additional evidence in the event that his requests for fees were denied. Panetti's track record of submitting no new evidence in his first Article 46.05 motion, *supra,* at 8, n. 6, and only two insubstantial exhibits in his second, Part II–A, *supra,* suggests that it was highly unlikely that Panetti planned to present anything else. Accordingly, the state-court proceedings to evaluate Panetti's insanity claim were not "contrary to, or . . . an unreasonable application of, clearly established Federal law," 28 U. S. C. §2254(d)(1).[10]

———————

[10] Because the Court fails to identify any bona fide constitutional violation, it provides a laundry list of perceived deficiencies in the state-court proceedings. *Ante,* at 18 ("[I]t appears the state court on repeated

## C

Because the state court did not unreasonably apply Justice Powell's procedural analysis, we must defer to its determination that Panetti was competent to be executed. See §2254(d)(1). Thus, Panetti is entitled to federal habeas relief only if the state court's determination that he is competent to be executed "was contrary to, or involved an unreasonable application of" Supreme Court precedent or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." §2254(d). Not even Panetti argues that this standard is met here.

Applying Justice Powell's substantive standard for competency, the state court determined that Panetti was competent to be executed, 1 App. 99; see also Tex. Code Crim. Proc. Ann., Art. 46.05(h), a factual determination that is "presumed to be correct." §2254(e)(1). That factual determination was based on an expert report by two doctors with almost no evidence to the contrary. See Part II–

―――――――

occasions conveyed information to petitioner's counsel that turned out not to be true; provided at least one significant update to the State without providing the same notice to petitioner; and failed in general to keep petitioner informed as to the opportunity, if any, he would have to present his case"). The state court did request the name of mental health experts from the parties but ultimately chose experts without input from the parties. *Ante*, at 5–7. It canceled a status conference and failed to give Panetti notice. *Ante,* at 6. It also never explicitly ruled on Panetti's motions despite its statements that it would do so later. *Ante*, at 7–8. But Panetti does not argue that the court-appointed experts were not impartial nor does he explain how the canceled status conference caused him any harm. Finally, although it might have been better for the state court to rule explicitly on Panetti's outstanding motions, it implicitly denied them by dismissing his claim. As for the state court's "failure to keep petitioner informed," after the court-appointed experts' report was issued, the judge sent a letter to counsel that made it clear that Panetti had one last chance to submit information. 1 App. 77–78. In short, none of these perceived deficiencies qualifies as a violation of any "clearly established" federal law.

A, *supra.* Hence, Panetti is not entitled to federal habeas relief under §2254.

## III

Because we lack jurisdiction under AEDPA to consider Panetti's claim and because, even if jurisdiction were proper, the state court's decision constitutes a reasonable application of federal law, I will not address whether the Court of Appeals' standard for insanity is substantively correct. I do, however, reject the Court's approach to answering that question. The Court parses the opinions in *Ford* to impose an additional constitutional requirement without undertaking any Eighth Amendment analysis of its own. Because the Court quibbles over the precise meaning of *Ford*'s opinions with respect to an issue that was not presented in that case, what emerges is a half-baked holding that leaves the details of the insanity standard for the District Court to work out. See *ante*, at 28–30. As its sole justification for thrusting already muddled *Ford* determinations into such disarray, the Court asserts that *Ford* itself compels such a result. It does not.

The four-Justice plurality in *Ford* did not define insanity or create a substantive standard for determining competency. See 477 U. S., at 418 (Powell, J., concurring in part and concurring in judgment) (stating that "[t]he Court's opinion does not address" "the meaning of insanity").[11] Only Justice Powell's concurrence set forth a standard:

> "[No state] disputes the need to require that those who are executed know the fact of their impending execution and the reason for it.

--------

[11] Justice Marshall's plurality opinion in *Ford* did not even go so far as to state that there should be a uniform national substantive standard for insanity. It is thus an open question as to how much discretion the States have in setting the substantive standard for insanity.

> "Such a standard appropriately defines the kind of mental deficiency that should trigger the Eighth Amendment prohibition. If the defendant perceives the connection between his crime and his punishment, the retributive goal of the criminal law is satisfied. And only if the defendant is aware that his death is approaching can he prepare himself for his passing. Accordingly, I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it." *Id.,* at at 422.

Because the issue before the Court in *Ford* was actual knowledge, not rational understanding, *ibid.*, nothing in any of the *Ford* opinions addresses what to do when a prisoner knows the reason for his execution but does not "rationally understand" it.

Tracing the language of Justice Powell's concurrence, the Court of Appeals held that Panetti needed only to be "'aware' of" the stated reason for his execution. *Panetti* v. *Dretke*, 448 F. 3d 815, 819 (CA5 2006). Implicitly, the Court of Appeals also concluded that the fact that Panetti "disbelieves the State's stated reason for executing him," *Panetti* v. *Dretke*, 401 F. Supp. 2d 702, 708 (WD Tex. 2004), does not render him "unaware" of the reason for his execution. The Court challenges this approach based on an expansive interpretation of Justice Powell's use of the word "aware." *Ante*, at 27–28. However, the Court does not and cannot deny that "awareness" is undefined in *Ford* and that *Ford* does not discuss whether "delusions [that] so impair the prisoner's concept of reality that he cannot reach a rational understanding of the reason for the execution" affect awareness in a constitutionally relevant manner.[12] *Ante*, at 26. Nevertheless, the Court cobbles

———————
[12] The Court points out that "the *Ford* opinions nowhere indicate that delusions are irrelevant to 'comprehen[sion]' or 'aware[ness]' if they so

together stray language from *Ford*'s multiple opinions and asserts that the Court of Appeals' test is somehow inconsistent with the spirit of *Ford*. Because that result does not follow naturally from *Ford*, today's opinion can be understood only as holding for the first time that the Eighth Amendment requires "rational understanding."

Although apparently imposing a new substantive Eighth Amendment requirement, the Court assiduously avoids applying our framework for analyzing Eighth Amendment claims. See *Ford, supra*, at 405 (first analyzing whether execution of the insane was among "those modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted" in 1791); *Roper* v. *Simmons*, 543 U. S. 551, 560–561 (2005) (considering also whether the punishment is deemed cruel and unusual according to modern "standards of decency"); *Atkins* v. *Virginia*, 536 U. S. 304, 312 (2002) (looking for "objective evidence of contemporary values," the "clearest and most reliable" of which is the "legislation enacted by the country's legislatures" (internal quotation marks omitted)). The Court likely avoided undertaking this analysis because there is no evidence to support its position.[13] See, *e.g., id.*, at 340–342 (SCALIA, J., dissenting) (discussing the demanding standard employed at common law to show that a prisoner was too insane to be executed). The Court of Appeals at least took an approach

————————

impair the prisoner's concept of reality that he cannot reach a rational understanding of the reason for the execution." *Ante*, at 26. By the same token, nowhere in the *Ford* opinions is it suggested that "comprehen[sion]" or "aware[ness]" is necessarily affected when delusions impair a prisoner. The Court refuses to acknowledge that *Ford* simply does not resolve this question one way or the other.

[13] Contrary to the Court's suggestion, the state of the factual record is not a genuine impediment to analyzing the constitutional question. See *ante*, at 28–30. Our Eighth Amendment framework requires relatively academic, abstract analysis. Specific facts regarding Panetti's condition are simply irrelevant to what the Eighth Amendment requires.

based on what *Ford* actually says, an approach that was far from frivolous or unreasonable. By contrast, the Court's approach today—settling upon a preferred outcome without resort to the law—is foreign to the judicial role as I know it.

\*　　\*　　\*

Because the Court's ruling misinterprets AEDPA, refuses to defer to the state court as AEDPA requires, and rejects the Court of Appeals' approach without any constitutional analysis, I respectfully dissent.