Laura Denvir Stith, Judge,
dissenting.
Mr. Clayton has a traumatic brain injury that has resulted in the loss of 20 percent of his frontal lobe and has presented reasonable grounds to believe his overall mental condition has deteriorated and he is intellectually disabled under Atkins v. Virginia, 536 U.S. 304, 317, 320, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and Hall v. Florida, — U.S. -, 134 S.Ct. 1986, 2001, 188 L.Ed.2d 1007 (2014). Mr. Clayton also has presented reasonable grounds to believe that he is incompetent to be executed and so, under Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), and Panetti v. Quarterman, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007), is entitled to a hearing at which his competence will be determined. This Court, nonetheless, rushes to reject his request for a hearing before a special master at which he can attempt to prove his incompetency claim and his claim that he is intellectually disabled. As explained in more detail below, the majority’s decision to proceed with the execution at this time and in these circumstances violates the Eighth Amendment ban on cruel and unusual punishment.

A. Timeliness of Petition for Habeas Relief

The majority opinion suggests that one of the reasons why the Court refuses to allow him a hearing is that the request has come so close to the date of execution. But the Ford claim can be made only once an execution date is set, as it is the defendant’s competency at the time of execution that is relevant. This Court set the execution date only on February 6, 2015. Counsel sought relief in federal court and then in this Court during the succeeding 33 days. Counsel can hardly be said to have tarried.
As to Mr. Clayton’s claim that he is intellectually disabled, part of his claim is that his brain injury has combined with the lack of treatment while in prison to render him more disabled over time. As time goes on, therefore, his condition has deteriorated. He most recently was examined in January 2015. This Court did not give notice it would decide to start setting executions almost monthly. Counsel could not know which clients they needed to get examined first or whose execution would be set when. But counsel had acted before this Court notified Mr. Clayton on February 6, 2015, that he would be executed just 39 days later. If that execution proceeds as scheduled, it will be the 14th execution this State will have carried out since November 2013 — the Court set three other persons’ executions, but those orders were later stayed by this Court or by the federal courts.
All of these executions have been carried out with less than 60-days’ notice. The same group of half a dozen lead counsel, aided by fewer than a dozen co-counsel, represent nearly all of those who have been executed, as well as others as to *755 whom the attorney general of Missouri has filed motions to set execution dates. Recently, this Court has been asked to consider giving six-months’ notice of execution dates because of the difficulties posed by the fact that the same small group of counsel represent nearly all of the death penalty petitioners, making it difficult for them to competently prepare pleadings or to recover from the death of one client, when they are unsuccessful, before turning to the next.
Ms. Carlyle, lead counsel for Mr. Clayton, has been lead counsel for three executed defendants in the last year alone— Michael Taylor, executed February 26, 2014; John C. Middleton, executed July 16, 2014; and Leon Taylor, executed just four months ago on November 19, 2014. Two of her other clients have received orders to show cause why execution dates should not be set. To suggest in these circumstances that these dedicated counsel are at fault for not filing papers a few weeks earlier is just plain unreasonable. It is also unreasonable to expect counsel to anticipate and have the ability to file pleadings and conduct needed medical and mitigation research and investigation simultaneously in the face of Missouri’s sudden rush of executions. I turn to a discussion of the substance of Mr. Clayton’s claim.[1]

B. Reasonable Grounds to believe Mr. Clayton is Intellectually Disabled

In Atkins the United States Supreme Court held that no legitimate penological purpose is served by executing a person who is “mentally retarded.”[2] Therefore, Atkins held, to execute an intellectually disabled person would violate the Eighth Amendment. 536 U.S. at 317, 320, 122 S.Ct. 2242. Atkins left “to the States the task of developing appropriate ways to enforce the constitutional restriction.” Id. at 317, 122 S.Ct. 2242. But the constitutional restriction bars execution of the disabled; the constitutional protection is not narrowed just because some states may not enact a statute that encompasses all intellectually disabled persons.
Missouri, like other states, passed legislation to comply with Atkins’ mandate. Missouri’s statute bars the execution of persons with an “intellectual disability,” which section 565.030.6, RSMo Supp. 2014, defines as:
[A] condition involving substantial limitations in general functioning characterized by significantly subaverage intellectual functioning with continual extensive related deficits and limitations in two or more adaptive behaviors such as communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work, which conditions are manifested and documented before eighteen years of age.
Florida also passed legislation to comply with Atkins’ mandate. Florida law defines intellectual disability as “significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18,” and defines “significantly subaverage general intellectual functioning” as “performance that is two or more standard deviations from the mean score on a standardized *756 intelligence test,” with the mean IQ test score as 100. Id. at 1994.
In Hall, Mr. Hall committed a murder in Florida for which he was subject to the death penalty. 184 S.Ct. at 1991. But Mr. Hall claimed that he was ineligible for the death penalty because he was intellectually disabled. He had an IQ test score of 71. The question was whether this qualified him for a hearing as to whether he was intellectually disabled. The Florida Supreme Court interpreted the meaning of its statute narrowly. It held that a score of 70 was two standard deviations below a score of 100, and this made 70 a strict IQ cut-off. Therefore, Florida held, “a person whose test score is above 70, including a score within the margin for measurement error, does not have an intellectual disability and is barred from presenting other evidence that would show his faculties are limited.” Id. at 1994. In fact, Florida held:
Pursuant to this mandatory cutoff, sentencing courts cannot consider even substantial and weighty evidence of intellectual disability as measured and made manifest by the defendant’s failure or inability to adapt to his social and cultural environment, including medical histories, behavioral records, school tests and reports, and testimony regarding past behavior and family circumstances. This is so even though the medical community accepts that all of this evidence can be probative of intellectual disability, including for individuals who have an IQ test score above 70.

Id.

The United States Supreme Court reversed and remanded. Id. at 2001. In doing so, the Supreme Court explained that the Florida Supreme Court disregarded established medical practice in two ways. Id. at 1995. First, the Florida Supreme Court took “an IQ score as final and conclusive evidence of a defendant’s intellectual capacity, when experts in the field would consider other evidence.” Id. This was error. In determining whether an individual is intellectually disabled, the Supreme Court stated, other factors regarding an individual’s adaptive functioning must be considered in addition to IQ, such as evidence of past performance, environment, and upbringing. Id. at 1995-96. Therefore, “when a defendant’s IQ test score falls within the test’s acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.” Id. at 2001.
Second, and interrelated with the first reason, the Florida Supreme Court relied “on a purportedly scientific measurement of the defendant’s abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise.” Id. at 1995. The Supreme Court said that many medical professionals agree that an IQ score should be considered a range rather than a fixed score, and such a range reflects the “standard error of measurement.” Id. Although Hall’s score was 71, the margin of error meant his score fell in a range between 66 and 76, creating the possibility that the defendant’s actual IQ was below 70. Id. But the Florida Supreme Court “used the test score as a fixed number, thus barring further consideration of other evidence bearing on the question of intellectual disability.” Id. at 1996. Hall held this was improper, and the Supreme Court remanded for a factual determination as to whether Mr. Hall was competent.
Here, as in Hall, Cecil Clayton most recently has posted an IQ score of 71. The majority does not deny that if Clayton had a score of 66, or some other score below 70, he would be entitled to a hearing *757 as to his intellectual disability. But, because his score is 71, it says he does not. This is exactly what the Supreme Court in Hall disallowed!
The majority tries to get around this issue by saying in a footnote that the “margin of error” argument was not raised. It is not clear why the majority would want to execute an intellectually disabled man regardless of whether the claim was preserved. To do so would be manifestly unjust.
In any event, the issue is not one that is waivable for multiple reasons. First, it is not an error that must be raised to .be preserved. It is just a scientific fact, a definition, of what is meant by a score of 70 — it means a range with 70 at its center. Margins of error are inherent in the testing, not a legal issue to be preserved. That is what Hall was all about.
Second, if Mr. Clayton is intellectually disabled, then the Eighth Amendment makes him ineligible for execution. Would the majority hold that if a 14-year-old had failed to raise his age at trial or in post-trial proceedings then it would be permissible to execute him for a crime he committed while he was a minor? Of course not; his age would make him ineligible for execution. So too, here, if Mr. Clayton is intellectually disabled, then he is ineligible for execution. Hall held that: “The death penalty is the gravest sentence our society may impose. Persons facing that most severe sanction must have a fair opportunity to show that the Constitution prohibits their execution.” Hall, 134 S.Ct. at 2001 (emphasis added). Mr. Clayton deserves a hearing here.
The majority also suggests that Mr. Clayton does not need a hearing, despite Hall, because Mr. Clayton presented evidence of his lack of competency at trial and it was rejected. But the issue here is not whether Mr. Clayton was sufficiently competent to assist in his defense or to be found guilty when he was convicted in 1996. The issue is whether Mr. Clayton is sufficiently competent today to be executed. Mr. Clayton alleges that his lack of treatment during his incarceration has worsened his condition. His 2004 IQ score of 71 has never been seen by a jury or considered by a Missouri court in an evidentiary hearing, and neither have the expert opinions given since his post-conviction hearing, opinions that support a finding of intellectual disability. Mr. Clayton’s score of 71 is within the standard error of measurement and Hall constitutionally requires that he be given a hearing to present evidence of impairments in both his intellectual and adaptive functioning.
The majority further suggests that if intellectual disability is an issue it must reach, it factually finds, from its own review of the record, that Mr. Clayton is not intellectually disabled and, therefore, will not give him a hearing. But that puts the cart before the horse. He needs to have the hearing before the Court can reject (or, there is always the possibility that the majority would accept) the evidence he presents at it. Mr. Clayton having shown he has an IQ score of 71, within the range of a score that is below 70, is entitled to a hearing at which he has opportunity to prove that intellectual disability before a fact-finding body, which this Court is not, at which he is entitled to present “other factors regarding an individual’s adaptive functioning that must be considered in addition to IQ, such as evidence of past performance, environment, and upbringing.” Hall, 134 S.Ct. at 1996-96.
The majority finally suggests that a Hall hearing need not be held because it is not mandated by Missouri’s statute, section 565.030.6, which defines “intellectual disability” as a disability that manifests *758 itself before the age of 18. But Mr. Clayton’s principal claim is not that he is entitled not to be executed under section 565.030.6. His claim is that he is entitled to relief under the Eighth Amendment as interpreted and applied in Atkins and Hall. Section 565.080.6 simply sets out the circumstances in which the legislature determined that a person is intellectually disabled. The legislature did not state that no one can become intellectually disabled after age 18, for to do so would be absurd. Of course people can become disabled later in life. In any event, the presumptive purpose of requiring a disability to manifest itself by age 18 is to preclude later faking of intellectual disability. Here, there is no factual dispute that Clayton suffered a brain injury and lost 20 percent of his frontal lobe, and that his IQ went down thereafter and long prior to the murder, so those concerns are not present.
Whatever section 565.060 says, it is axiomatic that the Eighth Amendment applies to all persons, so that under it a person who becomes intellectually disabled after age 18 may also seek relief from execution. Indeed, while, as the majority notes, Atkins left “to the States the task of developing appropriate ways to enforce the constitutional restriction,” 536 U.S. at 317, 122 S.Ct. 2242, Hall makes it clear that what is “appropriate” is limited by the Eighth Amendment. This is because the Atkins mandate that it is unconstitutional to execute someone who is intellectually disabled does not depend on when an intellectual disability manifested, but on whether an intellectual disability exists. It is not merely a statutory right and in fact this Court by rule barred the execution of individuals with intellectual disabilities before the statute was adopted. The right of an intellectually disabled person not to be executed is a human right protected by the Eighth Amendment.
Mr. Clayton is entitled to a hearing before a master on his claim of intellectual disability.

C. Mr. Clayton is Entitled to a Hearing under Ford v. Wainwright

Clayton also invokes his right to a competency hearing prior to his execution under Ford and Panetti. Indeed, the majority acknowledges that Ford requires a competency hearing when the defendant makes a showing that he does not understand the reason for his execution. But, it says, that is the only circumstance in which Ford or Panetti require a competency hearing. The majority opinion is wrong.
In Panetti, the Supreme Court explicitly held that merely being aware of the rationale for the execution — a murder — is not adequate to meet the required standard of competency, the prisoner must also understand the rationale for his execution. As Panetti stated:
We ... find no support ... in Ford, including in its discussions of the common law and the state standards, for the proposition that a prisoner is automatically foreclosed from demonstrating incompetency once a court has found he can identify the stated reason for his execution. A prisoner’s awareness of the State’s rationale for an execution is not the same as a rational understanding of it. Ford does not foreclose inquiry into the latter.
Panetti, 551 U.S. at 959, 127 S.Ct. 2842(emphasis added).
Further, Missouri has enacted a statute that spells out in greater detail what the Ford inquiry requires. Section 552.060.1 states: “No person condemned to death shall be executed if as a result of mental disease or defect he lacks capacity to understand the nature and purpose of the punishment about to be imposed upon *759 him or matters in extenuation, arguments for executive clemency or reasons why the sentence should not be carried out.” (Emphasis added).
The majority simply ignores the requirement that, unless Mr. Clayton understands the rationale for his execution and matters “in extenuation, arguments for executive clemency or reasons why the sentence should not be carried out,” then he is not competent to be executed. But shutting its eyes to this requirement does not make it go away.
The majority is also incorrect in suggesting that this Court can now decide on the present record whether Mr. Clayton is competent and as it finds he is, he does not need a hearing. That, again, puts the cart before the horse. The only issue for this Court is whether Mr. Clayton has presented reasonable grounds that, if believed, demonstrate he lacks the competency to be executed. If so, then this Court must allow a hearing at which a factual determination can be made. No such hearing has been held in a Missouri court. The record before this Court presents reasonable grounds to believe that Mr. Clayton can meet the Panetti or section 552.060.1 standard. As Dr. Logan noted after his examination of Mr. Clayton in January of this year:
Mr. Clayton due to his delusional denial, lacks the capacity to understand matters in extenuation, arguments for executive clemency or any reasons his attorneys might present as to why his sentence should not be carried out.
Another report states:
While Mr. Clayton knows the State plans to execute him for killing Deputy Castetter, he believes his legal situation is instead a test of his faith and that God will not allow the punishment to occur as God has chosen him for another mission. Hence, he has no concept of a need for clemency, or capacity to understand matters in extenuation, arguments for executive clemency or rational reasons why the sentence should not be carried out.
And Dr. Foster, whose testimony the majority much discusses, states that Mr. Clayton:
... remains, as he has been since I first met him, unable to fully participate, cooperate or comprehend his legal status, process and final, pending deliberations. While he can superficially seem intact, extended contact or observation exposes his multiple deficits, which continue their slow deterioration, despite the structured, secure setting in which he has resided over the past two decades. He is not simply incompetent legally, he would be unable to care for himself or manage basic self care, were he not in a structured environment that takes care of him. He can shower, groom, eat, walk, it is his comprehension, judgment, memory, limited intelligence and social deficits that plague him.
I do not find him competent to appreciate the purpose of his pending execution as addressed in Panetti v. Quarter-man and Ford v. Wainwright, should it not be stayed by the State of Missouri or the Federal Court. He can replicate elements of the fact that an execution follows a conviction for first degree murder, though still does not comprehend, appreciate nor understand its approaching date for him.
The special master may or may not believe these experts, or Mr. Clayton’s other evidence and experts, but Dr. Foster’s expert opinion, particularly as supported by Mr. Clayton’s 2004 IQ score of 71, presents reasonable grounds for a hearing. Mr. Clayton should be allowed the opportunity to convince the special master that *760 he is ineligible for execution because he is intellectually disabled or because he does not have a rational understanding of the reasons for his execution and does not have the capacity to understand matters in extenuation, arguments for executive clemency or rational reasons why the sentence should not be carried out. The denial of such a hearing deprives Mr. Clayton of a fair opportunity to show that the Constitution prohibits his execution.
For the foregoing reasons, I dissent.

. I do not respond to the majority's sua sponte decision to revisit Mr. Clayton's trial, appeal and earlier post-trial proceedings because the issues now raised by Mr. Clayton do not involve those proceedings.

. Being found "mentally retarded" now is referred to as being "intellectually disabled,” and the latter term will be substituted for "mentally retarded” for the remainder of this opinion.