# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 11-70018

United States Court of Appeals
Fifth Circuit

**FILED**

July 29, 2015

Lyle W. Cayce
Clerk

JEFFERY LEE WOOD,

Petitioner-Appellant,

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISIONS

Respondent-Appellee.

Appeal from the United States District Court
for the Western District of Texas
No. 5:01-CV-00423

Before HIGGINBOTHAM, DENNIS, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

After the district court denied death-row prisoner Jeffrey Wood's petition for habeas corpus relief, we granted in part and denied in part a certificate of appealability (COA) to review whether Wood had been denied a fair evidentiary hearing on his *Panetti* claim. In *Panetti v. Quarterman*, 551 U.S. 930 (2007), the Supreme Court held that the Eighth Amendment prohibits a prisoner from being executed if he is suffering from a mental illness that prevents him from rationally comprehending that the gravity of his crime is so

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-70018

serious that he must suffer the ultimate penalty for the purpose of the vindication of the community. *Id*. at 958. Following an evidentiary hearing on Wood's *Panetti* claim, the district court concluded that Wood had failed to prove that he suffered from a mental illness that made him incompetent for execution under the *Panetti* standard. Wood contends that the hearing was unfair and lacking in due process because the district court improperly took judicial notice, based on its own judicial experience, of the fact that many prisoners believe they have been unjustly persecuted by judges and prosecutors. After considering the parties' written and oral arguments and the record of the district court proceedings, we conclude that Wood was not denied a fair hearing by improper judicial notice of facts or in violation of due process. The district court fairly based its conclusion that Wood is competent for execution on the evidence in the record, consisting principally of the testimony and opinions of the parties' respective expert witnesses in psychology. The district court did state that the Director's expert's testimony that prisoners commonly believe that they are victims of official persecution was consistent with the judge's own judicial experience and observations. However, this statement did not constitute improper judicial notice of an adjudicative fact in the case; rather, the district court properly and fairly based its ultimate decision on the adjudicative facts it found from the evidence presented by the parties, including the Director's expert witness's testimony regarding her extensive qualifications in forensic psychology and experience in the examination and evaluation of prisoners' mental health.

## I.

A Texas jury convicted Wood of capital murder in 1998, and the state trial court thereafter sentenced him to death. After Wood's conviction and sentence were upheld on both direct appeal and in state habeas proceedings,

No. 11-70018

Wood filed his first 28 U.S.C. § 2254 habeas petition in federal district court, which was denied, *Wood v. Dretke*, 386 F. Supp. 2d 820 (W.D. Tex. 2005), and subsequently affirmed by this court, *Wood v. Quarterman*, 491 F.3d 196 (5th Cir. 2007).

Wood then filed a motion in state trial court requesting appointment of counsel and appointment of a mental health expert to assist him in investigating, developing, and presenting evidence supporting a claim that he is currently incompetent to be executed and, therefore, exempt from the death penalty pursuant to the Supreme Court's decisions in *Panetti v. Quarterman*, 551 U.S. 930 (2007) and *Ford v. Wainwright*, 477 U.S. 399 (1986). The state court denied Wood's motion, and the Texas Court of Criminal Appeals affirmed. *Wood v. State*, AP-75970, 2008 WL 3855534 (Tex. Crim. App. Aug. 19, 2008) (unpublished).

Wood thereafter filed in federal district court a motion for a stay of execution and motions for appointment of counsel and for funding of a mental health expert in order to pursue his *Panetti* claim in federal district court, which were granted. *Wood v. Quarterman*, 572 F. Supp. 2d 814 (W.D. Tex. 2008). Wood subsequently filed a petition for a writ of habeas corpus, contending that he lacked a "rational understanding" of his death sentence due to his "delusional belief system" and therefore was exempt from execution pursuant to the Supreme Court's decision in *Panetti*. In support of his claim, Wood presented the expert report of Dr. Michael Roman who opined that Wood suffered from a delusional disorder as defined by the DSM-IV-TR. More specifically, Dr. Roman, based on his examination of Wood, concluded that Wood held a persecutory delusion that his death sentence was the direct result of corruption within the Texas judicial system and a conspiracy between the assistant district attorney who prosecuted him and the judge who presided

over his trial.   According to Dr. Roman, "[b]ecause of [Wood's] strongly entrenched delusional belief system, [he] appears incapable of linking his execution with the robbery and murder" of which he was convicted.   In response, the Director submitted the expert report and testimony of Dr. Mary Alice Conroy who opined, after examining Wood, that he rationally understands the reason he is to be executed and the connection between his crime and his sentence; and that Wood does not suffer from a delusional disorder or any other mental illness for which delusions would be a symptom. In addition, the parties submitted a voluminous amount of documentary evidence addressing Wood's *Panetti* claim, including recordings of phone conversations between Wood and his family, Wood's medical and mental health records from his incarceration, correspondence by Wood while incarcerated, and records from the state court proceedings, which included Wood's school and medical and mental health records.   The district court also held a two-day evidentiary hearing at which it received evidence and heard the competing testimony of Wood's and the Director's respective experts.

On May 10, 2011, the district court issued an exhaustive memorandum opinion rejecting Wood's *Panetti* claim and denying his habeas petition.   *Wood v. Thaler*, 787 F. Supp. 2d 458 (W.D. Tex. 2011).   In its written reasons, the district court cited multiple reasons for rejecting Wood's claim.   For example, the court rejected as incredible Wood's argument that he actually believes his death sentence stemmed from a conspiracy between the prosecutor and trial judge.   *Id*. at 488-90, 499.   Observing that "there is considerable evidence in the record suggesting [Wood's] . . . conspiracy theory is little more than a 'ruse' . . . to avoid his own execution," the court emphasized the fact that there was no indication from the voluminous records submitted to the court that Wood had ever described to anyone, aside from his lawyers and the doctors involved

4

in this case, his purported belief that the prosecutor and trial judge had conspired against him. *Id.* at 488. In this connection, the court also noted that the "timing of [Wood's] assertion of his conspiracy is likewise suspicious," given that there is "no credible evidence . . . suggesting [he] ever voiced his current conspiracy theory to *anyone* prior to the Supreme Court's issuance of its opinion in *Panetti* on June 28, 2007." *Id.* at 489. The court likewise found problematic "the lack of specificity underlying [Wood's] conspiracy theory." *Id.* In light of the foregoing, the court determined that Wood had "failed to carry his burden of proving that he does, in fact, sincerely believe his conviction resulted from a malevolent conspiracy between his prosecutor and trial judge." *Id.* at 490.[1]

In addition, the district court also credited the testimony of the Director's expert, Dr. Conroy, over that of Wood's expert, Dr. Roman, and identified numerous reasons for doing so. First, the court detailed how "Dr. Roman . . . employs the term 'delusional' in a disturbingly casual manner that appears inconsistent with the definition of that term as used in the DSM-IV-TR." *Id.* at 490. Emphasizing that the "DSM-IV-TR defines 'delusion' in a very specific manner," the district court observed that Dr. Roman nevertheless "employed the term 'delusional' with an extremely broad brush, applying it to almost any belief possessed by petitioner that Dr. Roman did not consider to be factually accurate or subjectively rational." *Id.* at 491.[2] According to the district

---

[1] *See also id.* at 499 (observing that "petitioner's complaints about a conspiracy between his prosecutor and trial judge are not credible given (a) their suspiciously sudden appearance after the Supreme Court's *Panetti* decision was handed down, (b) their remarkable non-specificity . . . and (c) the fact petitioner apparently never told anyone other than his lawyer about his conspiracy theory until he filed his *Ford/Panetti* claim in August, 2008").

[2] *See also id.* at 494 ("While 'loose language' by an advocate can sometimes be excused,

No. 11-70018

court, "[f]urther diminishing the efficacy of Dr. Roman's diagnosis [was] the fact Dr. Roman appeared confused, or at least confusing, in his testimony . . . regarding whether petitioner's allegedly delusional belief system was bizarre or non-bizarre within the meaning of the DSM-IV-TR." *Id*. at 494. Relatedly, the district court also underscored the fact that Dr. Roman had not diagnosed Wood as having a delusional disorder when he evaluated Wood in connection with Wood's pre-trial competency hearings. *Id*. at 493.

As an additional reason for crediting Dr. Conroy's testimony over that of Dr. Roman, the district court emphasized the fact that Dr. Roman "expressly relied" on the Peters Delusions Inventory in determining that Wood suffers from a delusional disorder. *Id*. at 497-98. As the district court explained, "Dr. Conroy took exception to the use of that test instrument to help diagnose a mental disorder under the DSM-IV-TR, arguing that instrument was not designed to help diagnose mental disorders and that the term 'delusion' employed by Dr. Peters and her colleagues meant something entirely different from the meaning of that term within the DSM-IV-TR." *Id*. at 498. The district court also noted that Dr. Roman himself later admitted that the Peters Delusions Inventory is not a proper test for determining whether an individual suffers from a delusional disorder within the meaning of the DSM-IV-TR. *Id*. Evaluating Dr. Roman's expert testimony in light of this concession, the district court concluded:

> The point is not that Dr. Roman employed a single test, among many others, which he now admits had little utility in evaluating petitioner for a true mental disorder. Rather, the problem is that

---

Dr. Roman's peculiar predilection toward labeling petitioner's pretrial insistence on his own factual innocence 'delusional' raises questions about the validity of Dr. Roman's use of that same label when addressing petitioner's post-trial insistence he was 'railroaded' or otherwise unjustly convicted.").

> Dr. Roman spent seven full paragraphs and almost a full page in his written report . . . relating the details of petitioner's responses to the Peters Delusions Inventory in a manner suggesting Dr. Roman found petitioner's responses thereto very significant to his diagnosis of "delusional disorder."  It is not an exaggeration to state that, in his report, Dr. Roman appears to rely significantly, if not primarily, upon petitioner's responses . . . in reaching Dr. Roman's diagnosis that petitioner suffers from a persecutorial delusional disorder.   In light of Dr. Roman's subsequent admission as to the limited utility of the Peters Delusions Inventory, this Court finds even more evidence in the record to question the efficacy of Dr. Roman's "delusional" diagnosis.

*Id.*

Finally, in providing additional explanation for why it credited Dr. Conroy's expert testimony, the district court also emphasized the fact that Dr. Roman failed to consider Wood's subculture (*i.e.*, of death row inmates) in diagnosing him as having a delusional disorder—despite the fact that the "DSM-IV-TR *requires* consideration of an individual's cultural and religious background when evaluating the possible presence of delusional disorder." *Id.* at 495 (emphasis in original).   According to the district court, "[g]iven the plain language of DSM-IV-TR, . . . this omission from Dr. Roman's written report and testimony . . . greatly diminishes the credibility of Dr. Roman's conclusions."   *Id.*   By contrast, the district court noted that Dr. Conroy expressly considered Wood's subculture in determining whether his professed belief that his death sentence resulted from a prosecutorial-judicial conspiracy was symptomatic of a delusional disorder.   *Id*. at 480-81, 495-96.   As the district court explained:

> Dr. Conroy expressed the opinion, based upon her considerable experience working as a forensic psychologist with the Federal Bureau of Prisons for more than two decades, that it was quite common for inmates in maximum security prisons to belie[ve] the government was "out to get them" but that such beliefs do not

constitute "delusional disorders" within the meaning of the DSM-IV-TR nor do they portend any other psychotic disorder.   On the contrary, Dr. Conroy opined, the wide-spread belief within prison populations that individuals within the state or federal government have conspired to unjustly convict and sentence "innocent" individuals is, for many prison inmates, simply a means of "rationalizing" their current situations.

*Id.* at 495-96.

Also, the district court evidently rejected Dr. Roman's criticism of Dr. Conroy's opinions regarding the widespread prevalence of persecutorial beliefs within the prison population as lacking in empirical basis. Instead, the district court credited Dr. Conroy's opinions as based on her extensive experience with the mentality of prisoners and stated that Dr. Conroy's findings were "fully consistent" with the court's own "experiences over nearly two decades dealing with *pro se* prisoner litigants and death row federal habeas corpus petitioners." *Id.* at 496-97.   For example, the district court observed:

It is this Court's experience (based on review of hundreds, if not thousands, of prisoner pleadings and prisoner records) that beliefs in malevolent prosecution of "innocent" persons by the State of Texas are widespread within the Texas prison inmate population. . . . Thus, the culture of the Texas prison inmate population in general and subculture of the Texas death row inmate population in particular, is far from hostile to individual beliefs in persecutorial behavior by the State of Texas and its law enforcement agencies, officials, and officers.   Under such circumstances, petitioner's refusal to accept responsibility for his own criminal conduct and his expressions of facile rationalizations for his presence on death row do not render his vague conspiracy theory evidence of a "delusional disorder" within the meaning of DSM-IV-TR.

*Id.* at 497.

These statements by the district court regarding its prior experience with death-row inmates gave rise to the instant appeal.   Specifically, Wood

contends that the district court's statements regarding its judicial experience being "consistent" with some of Dr. Conroy's testimony evinces that he was deprived of a "fair hearing" in violation of his constitutional right to due process.    We now turn to that contention.

## II.

In support of his argument that he was deprived of a fair hearing, Wood relies primarily upon *Fox* v. *City of West Palm Beach*, 383 F.2d 189 (5th Cir. 1967), in which this court held that it was error for a trial judge to take judicial notice of material adjudicative facts in the case regarding the condition of land and cost of drainage, based largely on the judge's personal knowledge of the land in question.    Because these facts were not commonly known, and were subject to reasonable dispute, this court held that they therefore were not proper subjects of judicial notice and that the district court therefore erred in giving these facts dispositive weight to the underlying issue in dispute.    *Id.* at 194-195.    Wood argues that the district court in the present case similarly committed reversible error by taking judicial notice based on its own judicial knowledge and experience that many prisoners profess beliefs of persecution by prosecutors and judges.    The present case is clearly distinguishable from *Fox*, however, because here the district judge did not take judicial notice of the adjudicative facts that controlled its conclusion that Wood suffered from no mental illness that prevented him from understanding the relationship between his crime and his death sentence so as to render him incompetent to be executed under *Panetti* and *Ford.*    Instead, as a review of the record makes clear, the district court based its decision upon adjudicative facts found from the evidence introduced by the parties, principally from the testimony and reports of the expert psychological witnesses.    The district court's recognition that Dr. Conroy's findings were consistent, in part, with its own observation

that prisoners often profess persecutorial beliefs does not constitute an independent or essential judicial notice of an adjudicative fact; it was instead a legislative fact that was permissible for the court to take into account in its legal-reasoning process.[3] Consequently, the district court did not improperly take judicial notice of any of the adjudicative facts to which it applied the law in the process of its adjudication of Wood's *Panetti* claim.   Further, unlike the situation in *Fox*, the record here indisputably shows that the district court's judicial experience did not play a dispositive role in its resolution of the case or its decision to credit Dr. Conroy's testimony over that of Dr. Roman.   Indeed, as detailed above, the district court cited a multitude of reasons for crediting Dr. Conroy's opinion over Dr. Roman's that were not based on the court's prior judicial experiences with death-row inmates.

For these reasons, we see no legal error and conclude that the district court proceedings fully satisfied the requirements of fairness and due process. Accordingly, the judgment of the district court is AFFIRMED.

---

[3] *See* Fed. R. Evid. 201, advisory committee's note to subdivision (a) (There are "fundamental differences between adjudicative facts and legislative facts.   Adjudicative facts are simply the facts of the particular case.   Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body. . . . In view of these considerations, the regulation of judicial notice of facts by [Fed. R. Evid. 201] extends only to adjudicative facts.").