# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-14-00180-CR

**Curtis Adams, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
### NO. D-1-DC-11-904084, HONORABLE BOB PERKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found Curtis Adams guilty of aggravated assault with a deadly weapon other than a firearm. *See* Tex. Penal Code § 22.02(a)(2). The jury assessed punishment at twenty years in prison. On appeal, Adams complains that the court erred and violated several parts of the state and federal constitutions by denying him the chance to present his insanity defense, by admitting medical records that were not timely filed, and by denying his motion for mistrial based on the prosecutor's argument in court that appellant contends implied that he had committed prior bad acts. We will affirm the judgment.

## BACKGROUND

Three eyewitnesses testified that they saw appellant beat the victim in the street near the intersection of Airport Boulevard and Oak Springs in Austin. One witness testified that appellant was expressionless as he sat astride the victim and punched him quickly and repeatedly,

knocking him unconscious, drawing blood, and breaking his nose. The witness testified that appellant then walked calmly away. Another motorist saw the latter part of the altercation and described it similarly, except he was too far away to observe facial expressions. He said he followed the assailant and observed him until Austin Police Department officers arrested the man. A third witness testified that he saw the end of the beating and the assailant's casual walk away.

A paramedic who treated the victim at the scene testified that the victim was injured fairly critically with a lot of facial trauma and bleeding. She testified that his level of consciousness was low when she arrived but improved slightly as they transported him to the hospital. She rated his injuries as eight out of ten on the severity scale compared to the thousands of patients she had treated. She agreed that his injuries might have been life-threatening.

The victim testified that he suffered a broken nose, several cuts above his eye, a wound to his lip that required stitches, and a lot of pain in his legs. He said that he still suffered from severe headaches nine months later and that his vision was impaired by the assault. He also testified that the assault caused him to suffer memory problems. He did not remember the assault itself except for pain and a memory of trying to grab his assailant's leg.

APD Officer Michelle Gish testified that she was responding to a different complaint and stopped when she saw the victim lying in the street. She testified that he was bleeding from the face, nose, and mouth, and gurgling as he tried to breathe because blood was blocking or restricting his airway. Gish said she rolled him onto his side, supporting his head and neck, and he coughed and blood poured out of his nose and mouth. He was able to breathe better, but remained unconscious. APD Officer Jose Robledo took photographs at the scene and of the victim at the

hospital. He said that the victim seemed disoriented and claimed to be unaware that he had been assaulted. Robledo said he also took photos of appellant at the scene. He described appellant as cooperative.

APD Officer Robert Pfaff arrested appellant. He said that appellant was moving briskly away from the scene of the reported assault, but not running. He testified that appellant complied with the arrest but was verbally belligerent. Pfaff testified that he did not form an opinion of whether appellant was intoxicated. He also testified that appellant seemed fairly rational for a person under arrest and charged with a serious crime. Pfaff testified that he had dealt with "countless" mentally ill persons and that appellant appeared more rational than most. Pfaff testified that appellant's allegations of poisoning and behavior in his squad car were more indicative of substance abuse than mental illness. Pfaff agreed, however, that a fellow officer could be heard on the squad-car video describing appellant as "hardcore 10-96"—the code number for mental illness.

APD Officer Brent Cleveland testified that appellant seemed very upset, with behavior swinging from excited to crying. He testified that appellant made some statements that led the officer to believe appellant was paranoid. Cleveland said that appellant appeared to be intoxicated because of his demeanor, behavior, slurred speech, odor of alcohol, and admission that he had consumed four small bottles of rum. Cleveland testified that appellant said that drug dealers had taken his money without delivering drugs and that he attacked the victim because he believed the victim to be associated with the drug dealers. Cleveland testified that appellant also said he had requested to speak with the CIA because someone was attempting to poison him by putting

3

gas in the air where he lived.  Cleveland testified that he believed appellant to be both intoxicated and mentally ill.

Psychiatrist Dr. Harold Scott performed a court-ordered psychological evaluation of appellant.  He talked with appellant and watched recordings of his behavior at the scene after his arrest.  Scott testified that he diagnosed appellant as having an unspecified psychotic disorder and that this was consistent with a previous diagnosis of appellant as having a bipolar type of schizoaffective disorder.  Scott testified that appellant is delusional and that methamphetamine use might contribute to that, but opined that appellant suffered from mental illness before and independent of drug use.  He also testified that appellant had suffered carbon-monoxide poisoning when he was three years old and has borderline intelligence.  Scott testified that appellant said that, at the time of the attack, he had drunk rum and was coming down from using "speed" (likely meaning methamphetamines).  Scott testified that persons coming off meth use tend to be uncomfortable, paranoid, and emotional, and that alcohol use can have a disinhibitory effect, causing the user to be more likely to express any feeling.  Scott agreed that appellant was still delusional after months in jail which, presuming that appellant did not have access to drugs in jail, indicated that his delusions were independent of drug use.

Despite these diagnoses, Scott concluded that appellant was competent to stand trial and was sane at the time of the attack.  He opined that appellant manifested a diminished capacity to appreciate wrongfulness because of intense, emotional, and disordered thinking, but still could make the distinction.  Scott testified that he based his conclusion in part on appellant's statement that he "blew up" because of everything that had happened and that he anticipated being arrested.  Scott

4

also said that appellant's emotional response after being arrested—including saying "I'm sorry" repeatedly—was consistent with an awareness of right and wrong. Scott testified that he could not allocate how much of appellant's conduct was due to intoxication and how much was due to mental illness. Scott said that, while appellant's mental challenges and illnesses contributed to his actions, his primary motivator was rage at having money stolen by drug dealers. Scott testified that appellant's primary delusion about being gassed by his roommate was unconnected with his attack, and that appellant's belief that the victim was part of the earlier "hustle" was mistaken but not delusional. Scott testified that, although running from the scene would have been more consistent with awareness of wrongdoing, walking away was also consistent with wanting to leave.

Attempting to persuade the trial court to admit testimony about his insanity, appellant examined Phillip Baker in the jury's absence. Baker said that he had known appellant for eleven years and that appellant lived with him until a little over a month before the attack. Appellant abruptly moved to a mutual friend's home, Baker said, where he saw appellant a few times—the last time ten days to two weeks before the attack. Baker said that appellant was sullen and non-responsive during his visit. He also said appellant remarked that the fish tank was giving off bad vibes and that something was sending out waves to his brain. Baker said that appellant believed that people were feeding him something to gain control of him and that television and radio were sending messages meant personally for him. Baker testified that appellant was so wrapped up in religious delusions and paranoia that he did not know what he was doing or what was right and wrong. Baker said that appellant was likely without medication after he moved into the friend's house. Under

5

cross-examination, Baker conceded that he did not know appellant's mental state on the date of the attack. The trial court declined to admit the testimony at the guilt-innocence phase of trial.

## DISCUSSION

Appellant contends that the trial court erred by denying him the opportunity to present his insanity defense, admitting a medical report, and not declaring a mistrial based on the prosecutor's argument. He contends that these errors collectively violated the Fifth, Sixth, Eighth, and Fourteenth amendments to the United States Constitution as well as article one, sections 10 and 19 of the Texas Constitution.

### The court did not prevent appellant from presenting his insanity defense.

Appellant contends that the trial court violated all of the above-listed constitutional provisions by excluding Baker's testimony from the guilt-innocence phase of trial. He contends that he was wrongfully deprived of the opportunity to present his insanity defense, drawing on cases in which the Supreme Court discussed the right of death-row inmates to be heard in post-conviction procedures determining the inmates' competence to be executed. *See Panetti v. Quarterman*, 551 U.S. 930, 949 (2007) (habeas in Texas); *Ford v. Wainwright*, 477 U.S. 399, 404-05 (1986) (Florida's gubernatorial review); *see also Clark v. Arizona*, 548 U.S. 735, 769 (2006) (due process requires allowing defendant to present favorable evidence). These cases do not require reversal here.

In *Ford*, three psychiatrists interviewed the prisoner for thirty minutes and wrote separate reports that were given to the governor, who then made the competence decision. *Ford*, 477 U.S. at 404. Ford filed an application for writ of habeas corpus, but the trial court declined to

6

hold an evidentiary hearing on the issue of the adequacy and accuracy of the psychiatrists' findings and the governor's decision. *Id*. at 405-06. In his concurrence,[1] Justice Powell opined that the inmate was denied due process because Florida law did not require the governor to consider materials submitted by the petitioner and the governor publicly announced that he would not consider such materials. *Id.* at 423-24. Powell opined that the procedure invited arbitrariness and error by preventing the affected parties from offering contrary medical evidence or even from explaining the inadequacies of the State's examination. *Id.* at 424. Powell opined that adequate procedure would permit the prisoner to submit evidence and argument, including expert evidence that differed from the State's examiners, but that beyond that the States should have substantial leeway to balance competing interests. *Id*. at 427. He opined that the process could be "far less formal than a trial." *Id.*

In *Quarterman*, the Supreme Court rejected the Texas trial court's treatment of a habeas petition filed in response to the setting of a prisoner's execution date. 551 U.S. at 937-38. The state district court in that case found the prisoner competent based solely on an assessment by two state-appointed examiners who were not subject to cross-examination. *Id*. at 940-41. The Supreme Court held that the state court did not provide even minimal due process because it refused to transcribe its proceedings, repeatedly conveyed untrue information to the prisoner's counsel, provided at least one significant update to the State without providing it to the prisoner, failed to

---

[1] The *Quarterman* court held that, because the opinion of the court was delivered by a plurality and Powell's concurrence was the narrower decision, Powell's concurrence setting out parameters for due process controlled. *Panetti v. Quarterman*, 551 U.S. 930, 949 (2007) (concerning *Ford v. Wainwright*, 477 U.S. 399, 418 (1986) (Powell, J., concurring)).

apprise the prisoner of his chance to present his case, failed to provide a competency hearing, apparently decided his competency based solely on the basis of the court-appointed psychiatrists, and failed to provide the prisoner with an adequate opportunity to submit expert evidence in response to the report filed by the court-appointed experts. *Id*. at 950-51.

The structural issues in *Ford* and *Quarterman* are absent here, and the process that those courts held is due was provided to appellant. Here, the court held a trial at which appellant cross-examined the examining psychiatrist and at which eyewitnesses testified regarding their impressions of appellant's sanity. Appellant did not offer a competing expert and so was not "prevented" from presenting one. There are no allegations of judicial misrepresentation and ex parte contact. The trial court did not utterly refuse to consider evidence submitted by appellant; instead, it heard Baker's testimony and sustained the State's objection that Baker's testimony would be irrelevant because he did not describe behaviors demonstrating an inability to determine right and wrong and did not observe them near enough in time to the attack to be relevant to appellant's state of mind at the time of the attack. This judicial determination of irrelevance is not the structural denial of due process struck down in *Ford* and *Quarterman* and is well within the realm of the "substantial leeway" afforded to states to determine how to provide due process. *Quarterman*, 551 U.S. at 951 (citing *Ford*, 477 U.S. at 427). This is simply an exclusion of evidence, and the constitution permits the exclusion of relevant evidence. *Clark*, 548 U.S. at 770.

We review the exclusion of evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). We will affirm the trial court's decision if it is supported by the record and is correct under any theory of applicable law in light of what was

8

before the trial court when it ruled. *Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005). Evidence is relevant if it has any tendency to make the existence of a consequential fact more or less probable. Tex. R. Evid. 401. To prove insanity, a party must show that he was suffering from a severe mental disease or defect and did not know right from wrong at the time of the offense. *See* Tex. Penal Code § 8.01(a). Lay witnesses can give their opinion regarding insanity, but that opinion must be based on personal observation. *Bigby v. State*, 892 S.W.2d 864, 888 (Tex. Crim. App. 1994); *see also* Tex. R. Evid. 701.

We conclude that the trial court did not abuse its discretion by excluding Baker's testimony. Although Baker said on direct examination that he believed that appellant did not know right from wrong, he conceded that he did not see appellant for at least ten days before the attack, and did not support his conclusion with examples of statements or behaviors that bore directly on the issue of whether appellant could distinguish right from wrong. By contrast, the State's expert whose examination of appellant was much more remote in time nevertheless cited behaviors immediately following the assault, such as repeatedly saying "I'm sorry" in the back of the police car. Based on the record before us, we cannot say that the trial court abused its discretion by sustaining the State's relevance objection to Baker's testimony.

Even if the trial court had abused its discretion, we conclude that the exclusion of the evidence was harmless. Appellant's commission of the assault is not at issue. The jury had evidence of appellant's mental disturbance before it. APD Officer Cleveland testified that he believed that many of the behaviors described by Baker showed that appellant was mentally ill. Dr. Scott testified similarly, but concluded that appellant nevertheless knew right from wrong. Baker's testimony was

9

not unequivocal. On cross-examination during voir dire, when the State asked, "So in all fairness, you are not in a position to render any opinion as to whether he knew the difference between right and wrong on February 7th, 2011, when he beat [the victim]; is that correct?" Baker responded, "Yeah, pretty much." Because of the cumulative nature of much of Baker's testimony and the limitations he himself placed on its scope, we cannot say that the exclusion of Baker's testimony affected appellant's substantial rights. *See* Tex. R. App. P. 44.2(b).[2]

**The admission of the victim's medical records was not harmful error.**

Appellant contends that the admission of the victim's EMS Patient Care Report violated appellant's rights to a fair trial and to confront witnesses against him because the records were not filed with the clerk fourteen days before trial as required to qualify for a hearsay exception. *See* Tex. R. Evid. 902(10). Without deciding whether the trial court erred, we find no harm from the admission of the evidence. First, we note that there was ample evidence of the victim's injuries apart from the EMS report. More important, the only disputed issue at trial was whether appellant was sane at the time of the assault,[3] as shown by appellant's counsel's preface to his closing argument at trial:

---

[2] Even if the exclusion affected the listed constitutional rights, we conclude beyond a reasonable doubt that the exclusion of this evidence did not contribute to appellant's conviction or punishment. *See* Tex. R. App. P. 44.2(a).

[3] We reject any argument that the EMS record contributed to the jury's findings on the standard elements of the crime. There was ample, undisputed testimony admitted about the attack, appellant's role in committing it, the victim's injuries, and the treatments required to address them. The court admitted pictures of the victim's bloodied face, the bloodied sheets around him, the neck collar EMS deemed necessary, the backboard, and the pool of blood on the street surrounding the victim at the scene.

> We, Mr. Adams and I, we're not disputing the facts on the ground. It's obvious, I believe, from the evidence that an assault occurred. The question is and what we've heard testimony on and what we've been arguing about is what was going on in Mr. Adams' mind at the time.

The *victim's* treatment records in this case are wholly irrelevant to the issue of *appellant's* sanity, so any error in their admission had no effect on appellant's substantial rights, and we conclude beyond a reasonable doubt that any error in admitting this record did not contribute to the conviction or punishment. *See* Tex. R. App. P. 44.2(a), (b).

**The trial court did not abuse its discretion by denying a motion for mistrial based on a portion of the State's jury argument.**

Appellant contends that the prosecutor's jury argument was so improper that the trial court should have declared a mistrial. We review denials of motions for mistrial for an abuse of discretion. *See Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). Permissible jury argument falls within one of four areas: (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) response to the defendant's argument, and (4) plea for law enforcement. *Borjan v. State*, 787 S.W.2d 53, 55 (Tex. Crim. App. 1990). If a jury argument exceeds these categories, an instruction to disregard it normally will cure any wrong unless the argument is extreme or manifestly improper, violates a mandatory statute, or injects new facts harmful to the accused. *Cooks v. State*, 844 S.W.2d 697, 727 (Tex. Crim. App. 1992). When deciding whether improper argument merited a mistrial, we look at three factors: 1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); 2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and 3) the certainty of conviction absent the

11

misconduct (the strength of the evidence supporting the conviction). *Mosley v. State*, 983 S.W.2d

249, 259 (Tex. Crim. App. 1998).

Appellant complains of the following passage of the State's jury argument at the

guilt-innocence stage:

> You don't get to consider what you think should happen to this man today, right now,
> because he has a second phase of trial, and during that phase you are going to hear
> more information. You are going to hear more information about this defendant from
> the State and you are going to hear more information about this defendant from the
> defense attorney, so you don't get to think about what you think should happen to
> him when you're making your decision today because you don't know the whole
> story about him.

Defense counsel objected that the phrase "the whole story about him" referred to facts not in

evidence and was inappropriate. When the prosecutor responded, "I'll move on," the court sustained

the objection and instructed the jury to disregard the remark, but overruled the motion for mistrial.

Appellant contends that this argument improperly refers to facts that are neither in evidence nor

inferrable from the evidence and are designed to arouse the passion and prejudice of the jury. He

contends that this statement was irrelevant and immaterial to any issue in the case and not curable.

We find no abuse of discretion in the trial court's denial of a motion for mistrial. The

prosecutor made the remark at the end of a passage distinguishing the phases of a criminal trial that

echoed the following section of the court's charge:

> In deliberating on the cause you are not to refer to or discuss any matter or issue not
> in evidence before you; and in determining the guilt or innocence of the defendant,
> you shall not discuss or consider the punishment, if any, which may be assessed
> against the defendant in the event he is found guilty beyond a reasonable doubt.

12

The objected-to phrase in the State's argument was not specific about what the rest of appellant's story would be.  It could have referred to appellant's medical history or any of a number of facts.  It does not refer to other crimes or wrongs committed by appellant or anyone.  *See Borjan*, 787 S.W.2d at 57.  It is not remotely close to the case appellant cites in which the court found that the State's argument injected irrelevant and unduly prejudicial facts into the record.  *See Ex parte Lane*, 303 S.W.3d 702, 711-12 (Tex. Crim. App. 2009) (in a drug possession case, State argued beyond the record that the defendant was bringing drugs into the county to poison children and turn them into addicts).  Even if the jury assumed the worst because the argument came from the State, the statement that the jury did not know appellant's whole story was (a) true and (b) so vague and so mild that the instruction to disregard mitigated any harm from its existence.  Based on the record, we conclude that conviction was near certain and that the vague remark did not tip the scale at all.

## CONCLUSION

Finding no reversible error, we affirm the conviction.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Goodwin and Field

Affirmed

Filed:   January 8, 2016

Do Not Publish